Frank W. TURNEY, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–6932.

Supreme Court of Alaska.

April 4, 1997.

Rehearing Denied May 20, 1997.

See also 922 P.2d 283.

J. John Franich, Assistant Public Advocate, Fairbanks, and Brant McGee, Public Advocate, Anchorage, and Deborah Niedermeyer, Fairbanks, for Petitioner.

Eric A. Johnson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Rachel King, Anchorage, for Amicus Curiae Alaska Civil Liberties Union.

Leonard J. Karpinski, Anchorage, for Amicus Curiae Fully Informed Jury Association.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Frank Turney was charged with jury tampering under AS 11.56.590 and criminal trespass under AS 11.46.330(a)(1), as a result of his activities in and near the State Courthouse in Fairbanks. We here consider whether the jury tampering statute is unconstitutionally overbroad or void for vagueness. We also consider whether Turney could commit a criminal trespass on public property at a time when the property was open to the public. The superior court denied Turney's motion to dismiss the charges. We granted his petition for hearing to consider these issues. We affirm.

## II. FACTS AND PROCEEDINGS

### A. Facts

#### 1. Court premises

On May 9, 1994, the Alaska Court System Area Court Administrator, Ronald Woods, gave Turney a letter concerning his activities in and near the court building. It stated:

Dear Mr. Turney,

You have utilized court property as a public forum. Moreover, the manner in which you have done this is disruptive of court business. Citizens and court staff have complained that you have aggressively accosted them on and immediately adjacent to court property in a manner they found threatening. You have pounded on the building's walls, windows, and doors. You have shouted, blown whistles, and made animal noises with the intention of

attracting or distracting the attention of jurors and other persons in the building.

You are welcome in and upon the court's premises to peaceably conduct court business or to observe court proceedings. However, court property is a non-public forum. You are prohibited from entering or remaining on court property to engage in protest activities, picketing, or pamphleteering. You are prohibited from entering or remaining on court property to erect signs on the premises. You are prohibited from making excessive noise that disrupts or interferes with court business.

Court property extends to the street curbs surrounding the courthouse. The sidewalks encircling the courthouse are a traditional public forum, subject only to reasonable time, place, and manner restrictions. Accordingly, you may use the sidewalks as a forum. However, whether on court property or adjacent to it, you are prohibited from impeding access to the building by other persons, either by physical or verbal means, and you are prohibited from making excessive noise which disrupts or interferes with court business.

These prohibitions apply to any individual which [sic] attempts to utilize court property for a purpose other than the conduct of court business.

Should you engage in prohibited activity, you will be subject to arrest and prosecution.

### 2. Juror contact

On July 14, 1994, a jury was selected at the State Courthouse in Fairbanks in the case of *State of Alaska v. Merle Hall*. Merle Hall was to be tried under AS 11.61.200(a)(1), which prohibits convicted felons from knowingly possessing a concealable weapon.

Frank Turney was then in the courthouse, as he often was, promoting what he argues is his "political point of view on the jury system." His advocacy included signs, leaflets, discussion, and demonstrations. He also publicized the telephone number of the Fully Informed Jury Association (FIJA).[1] Turney was apparently interested in the *Hall* case because he was a friend of Hall's and was also a critic of AS 11.61.200(a)(1), having been convicted in Oregon in 1975 of being a felon in possession of a firearm.

The attorney defending Hall, William Satterberg, was familiar with Turney and saw him at the courthouse the day of jury selection. Turney was in the courtroom during jury selection. The Assistant District Attorney testified that "Frank pretty much monitored that trial from jury selection through verdict."

The judge presiding over the *Hall* trial, Judge Jane Kauvar, instructed the jurors that it was their duty to follow the law. The jurors were given a pamphlet entitled the Alaska Trial Jury Handbook soon after they began their jury service, and were shown an orientation video. "Juror" is statutorily defined to mean "a person who is a member of an impanelled jury or a person who has been drawn or summoned to attend as a prospective juror." AS 11.56.900(3).

Turney's jury tampering charges concerned his contacts with three jurors: Coty, Flood, and Ellis.[2] Turney approached Juror Coty and other jurors while they were near the elevators on the fourth floor of the court building, the floor where the jury was to be selected. From about fifteen feet away, Turney told them to call the 1–800–TEL–JURY number. Some jurors were wearing juror

---

1. This telephone number was "1–800–TEL–JURY." One calling this number hears the following recorded message:

   Thank you for calling the Fully Informed Jury Association. FIJA is a nonprofit educational association that wants all Americans to know their rights as jurors to judge the law itself as well as the facts regardless of the instructions from the judge because jurors can not be punished for their verdict. They are the final check and balance on our government, with more power than the President, [C]ongress, or

[the] Supreme Court. To talk to a live person, call 406–793–5550 or we will mail you more free information on jury veto power, if you tell us how you heard of us. Then name and spell your name, address, and zip code. Here's the tone. [TONE]

2. The superior court found that "[t]here is no evidence to show that either the judge in the case, the District Attorney's Office, Hall, or Hall's attorney authorized, sought, or desired Mr. Turney's contact with the jurors in the case."

badges that identified them as jurors; jury selection had apparently not yet commenced.

While driving home the next day, Satterberg saw Turney walking. Satterberg gave him a ride hoping Turney could tell him something about a break-in at Satterberg's office. During the drive, Turney mentioned that he had gone fishing with "one of the jurors" in the *Hall* case. He did not identify the juror or say when the fishing trip had taken place.

The *Hall* trial was held on Monday, July 18. It lasted about three hours. Jurors Flood, Roit, and Ellis went outside the court building to smoke. At least one was wearing a juror badge. Turney approached them, and told two jurors to call the FIJA telephone number. He said he wanted to know if they knew what their rights as jurors were. Jurors Flood and Roit ignored Turney. The jury began deliberations, but did not reach a verdict.

During deliberations the next day, Juror Ellis told other jurors that he had called the number,[3] and that he was changing his vote. He told them that "I can vote what I want." He also told them that they should call the number.[4]

Satterberg saw Turney outside the courthouse in the late afternoon or evening of July 18. Turney mentioned the status of the jury, and said something that caused Satterberg to comment: "Frank, you know, I don't want to know about that stuff, it's something that would be improper.... [I]f you're telling me that you've been talking to any jurors,

I'm going to have to report you.... [B]ut, if you're bullshitting me, then that's a different story." Satterberg stated that Turney just smiled, and said "it's all bullshit."

Turney called Satterberg that evening concerning the break-in. Satterberg testified that during one of their July 18 conversations, Turney said something to the effect of "you have a hung jury, and I know how they stand."

The jury announced the next morning that it could not reach a decision, and was excused. Jury Foreman Romersberger testified that two jurors had changed their votes to "not guilty" after speaking with Turney or calling the number,[5] leaving the jury deadlocked at eight "guilty" votes to four "not guilty" votes. He testified that the jurors who had switched stated that "their conscience was greatly relieved, and they were going to vote their conscience."

After the court excused the jurors, Satterberg spoke to several in the hallway. Turney was in the immediate vicinity, and may have been talking to other jurors.

That same day, after the jury had announced its inability to reach a verdict, Turney called in to a radio talk show. He telephoned the show "to express his opinion that Hall should not have been prosecuted for possessing a concealable firearm since Hall previously had been convicted only of a non-violent felony."

Satterberg later had another conversation with Turney about the jurors. Satterberg testified that during this conversation, he

---

**3.** Juror Ellis himself was unsure when he called. He admitted he listened to the recording, but stated that he did not leave his name or address. He also testified that he had seen a television program on jury nullification about a week before the trial. He testified that he knew of Turney and his activities before the trial. However, it was only after the trial that he began to speak to Turney on a regular basis.

**4.** Juror Paluck testified that Juror Ellis suggested she call the 1–800–TEL–JURY number. She called the number, but apparently only after she had already decided how she was going to vote. When asked whether the recording was in conflict with the judge's instructions, Juror Paluck responded: "Well, basically when the judge instructs us, they tell us that we can't ... you can't vote your feelings, you have to vote according to

the letter of the law. And the—and the tell jury deal, from what I gathered from the recording that I got that I have more rights than what was read to me by the judge."

Juror Rice testified that Juror Ellis had told him that he had called the number, and that they had not been told their full rights as jurors. Juror Rice testified that Juror Ellis told him that they also had the right to ask questions, and that they did not have to follow the law. However, Juror Rice also testified that Juror Ellis did not tell him to call the number, or try to get him to change his vote.

**5.** Juror Romersberger also testified that he did not gain this information directly from those jurors, but was later told by another juror that they had called the number.

pointed out to Frank that it was very serious to be dealing with a jury while a jury is in process. You can talk to 'm before, you can talk to 'm afterwards. And we got into a discussion about how he felt that he had a constitutional right to educate the jurors on the jurors' rights issues. And he and I had a difference of opinion on that issue, on the—on the fully informed jury situation. And he kept saying that it was an educational thing.

In a July 20 telephone conversation with Satterberg, Turney recanted his earlier denial of involvement with the jurors. Satterberg paraphrased Turney's statement to him as: "I know I told you I was bullshitting you; but … I wasn't. I did talk to the jurors, and you can tell Judge Kauvar, if you want, and you can report me, if you want."

Later that day the *Hall* prosecutor, Assistant District Attorney Jeffrey O'Bryant, ran into Turney outside the court building. Turney told O'Bryant that he had spoken with the jurors about FIJA. Turney admitted he knew that they were jurors in the *Hall* case. O'Bryant told Turney that if he had had contact with the jurors, O'Bryant had

> an ethical obligation and duty to advise Judge Kauvar of—of the type of contact, whatever it was, that took place. Frank acknowledged to me that—basically, that he had contact with two or more jurors here in the hallway during the course of the trial, and that he had contact with three of the jurors out in front of the courthouse. And I believe that was—that was also during the course of the trial.… He did indicate to me, though, that he— the subject matter of his conversation with the jurors was the Fully Informed Jurors' Association beliefs or credos. The a—basically, a right to vote your conscience. And his making them aware of that organization. He didn't recall whether he dis-

seminated any—disseminated any brochures or—or written material to them.

### B. *Proceedings Below*

A grand jury indicted Turney on three counts of jury tampering under AS 11.56.590; he was also charged by information on two counts of criminal trespass in the first degree under AS 11.46.320(a)(1). The superior court denied Turney's motion to dismiss the charges. In doing so, the court construed the intent provision of the jury tampering statute "to prohibit communications with a juror only when the defendant's *primary* intent is to influence a juror's vote, opinion, decision or other action as a juror in a particular case." The court of appeals denied Turney's petition for interlocutory review. Turney then filed a petition for hearing in this court. We granted his petition to consider several issues.

### III. *DISCUSSION*

#### A. *Standard of Review*

▆▆▆ The constitutionality of the jury tampering statute "is a matter of constitutional and statutory interpretation in which the appropriate standard of review is this court's independent judgment." *In re Inquiry Concerning a Judge*, 762 P.2d 1292, 1293 (Alaska 1988). The criminal trespass issue raises a question of law which we review de novo. *Langdon v. Champion*, 752 P.2d 999, 1001 (Alaska 1988). The court adopts "the rule of law that is the most persuasive in the light of precedent, reason, and policy." *Guin v. Ha*, 591 P.2d 1281, 1284 n. 6 (Alaska 1979).

#### B. *Does AS 11.56.590 as Written Criminalize Constitutionally Protected Speech?*

The Alaska Constitution and the United States Constitution both protect freedom of speech.[6]

> Although Turney argues that his appeal should be considered in light of the broader protection of speech guaranteed under the Alaska Constitution, we conclude that the analysis, and thus the result, is the same under both the State and Federal Constitutions. We will accordingly limit our discussion to the federal constitutional issues raised by Turney.

---

**6.** Article I, section 5 of the Alaska Constitution provides that "[e]very person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right." This court has previously held this protection "to be at least as broad as that of the First Amendment of the United States Constitution." *Vogler v. Miller*, 651 P.2d 1, 3 (Alaska 1982) (citations omitted).

Turney first argues that Alaska's jury tampering statute, AS 11.56.590(a), is void for overbreadth because it criminalizes constitutionally protected speech. Alaska Statute 11.56.590(a) provides:

(a) A person commits the crime of jury tampering if the person directly or indirectly communicates with a juror other than as permitted by the rules governing the official proceeding with the intent to

(1) influence the juror's vote, opinion, decision, or other action as a juror; or

(2) otherwise affect the outcome of the official proceeding.

▆▆▆ A statute regulating speech is overbroad, and thus unconstitutional, "when constitutionally protected conduct as well as conduct which the state can legitimately regulate are included within the ambit of [a] statute's prohibition." *Marks v. City of Anchorage,* 500 P.2d 644, 646 (Alaska 1972) (holding that a breach of the peace statute was overbroad). A defendant need not show that his conduct was itself protected as a prerequisite to attacking such a statute as overbroad or vague. *Gottschalk v. State,* 575 P.2d 289, 290 n. 2 (Alaska 1978).

The superior court considered and rejected Turney's overbreadth argument. It reasoned that because the statute is "theoretically broad enough" to encompass a courthouse picketer whose "primary intent" is to convey a political message and who has "a subsidiary or incidental intent" to influence passing jurors, the statute raised overbreadth "concerns." The court nonetheless held the statute to be constitutional because the intent provision of the statute "must be interpreted to prohibit communications with a juror only when the defendant's *primary* intent is to influence a juror's vote, opinion, decision, or other action as a juror in a particular case."

Turney argues that the language of AS 11.56.590 is extremely broad,[7] and that as a

result it criminalizes constitutionally protected speech. Turney argues that

the Alaska Legislature enacted a statute which did not link the crime of jury tampering to communications intended to influence a juror's actions *with regard to a particular case,* (as the Superior Court wrote into the statute), but instead quite deliberately and carefully criminalizes communications intended to influence *any* of a juror's actions as a juror.

He further argues that "[a]n examination of AS 11.56.590 through the lens of First Amendment rights reveals a law with a reach so wide that virtually *any* communication to a juror may be criminal.... Moreover, the statute criminalizes such statements no matter where, no matter how they are uttered." According to Turney, the legislature's failure to limit the statute's reach to communications intended to influence a juror's "action in a case" renders the statute unconstitutionally overbroad. Turney also argues that the superior court could not permissibly rewrite the statute by inserting the words "in a particular case" to narrow its scope.[8]

▆▆▆ In deciding whether AS 11.56.900(3) is overbroad, we must first determine the precise boundaries of the speech the statute prohibits. *See State v. Linares,* 232 Conn. 345, 655 A.2d 737, 747 (1995). Then we must decide if any speech that is protected by the First Amendment falls within the ambit of the statute's prohibition. Professor Tribe comments that

overbreadth analysis ordinarily compares the *statutory* line defining burdened and unburdened conduct with the *judicial* line specifying activities protected and unprotected by the first amendment; if the statutory line includes conduct which the judicial line protects, the statute is overbroad and becomes eligible for invalidation on that ground.

Laurence H. Tribe, *American Constitutional Law* § 12–27, at 1022 (2d ed. 1988).

---

7. Turney argues that the sweep of Alaska's jury tampering statute is as broad as or broader than "any jury tampering statute in our nation." He summarizes its legislative history, and compares it to the development of similar statutes in other states.

8. The Alaska Civil Liberties Union and the FIJA filed amicus briefs which also argue that AS 11.56.590 is unconstitutional.

■ Turney overestimates the breadth of the statute as written. Subsection (a)(1) is limited to communications "with a juror" made with the intent to "influence *the juror's vote, opinion, decision, or other action as a juror.* ..." (Emphasis added.) The words "vote, opinion, decision" specify salient components of the principal duty of a juror—to decide the outcome of the case. The phrase "or other action as a juror," must be read in the context of those specified juror functions; it connotes juror activities that carry out the responsibilities entrusted to the juror. The emphasized language thus requires an intention to influence a juror in the context of performing the juror's duties.

Alaska Statute 11.56.590(a) does not prohibit communication with jurors that is "permitted by the rules governing *the official proceeding.*" (Emphasis added.) The words "the official proceeding" further limit the scope of the prohibited communication with jurors to the context of their participation in *an* actual, specific proceeding.

■ Likewise, these words convey a notion that the statute prohibits communications intended to transmit substantive messages (i.e., those that affect deliberations) not permitted by the governing rules. Subsection (a)(1) thus prohibits communication with jurors, other than that permitted by the governing rules, conveyed with the intent to influence a juror in his or her capacity as a juror in reaching a decision in a particular case.

Moreover, the word "official" would be superfluous (because a court "proceeding" is intrinsically "official") unless it were read to strengthen the notion that the communications must be intended to affect how jurors conduct themselves in an actual ("the") proceeding.

■ Subsection (a)(2) reaches communications made with the intent to "otherwise affect the outcome of the official proceeding." The word "otherwise" confirms that subsection (a)(1) is also directed at "the" official proceeding. Read as a whole, the plain language of subsection (a) leaves no doubt that it is directed at communications intended to affect how the jury decides a specific case.

Turney asserts that the statute is defective because it is not limited, as are equivalent statutes elsewhere, to actions in a particular case. Our reading of AS 11.56.590(a), however, leads us to conclude that it is limited to particular matters. It therefore would not reach institutional messages that are broadcast to the general public on such topics as the adverse effects of insurance fraud or the wisdom of tort reform.

■ Here the three jurors had been part of the venire called specifically for selection and possible participation in the *Hall* jury. Reading the statute to include potential jurors who have been summoned specifically to participate in the jury selection process for a particular case, but who have not yet been selected for duty in that case, would not infringe upon constitutionally protected speech.

■ To support his argument that AS 11.56.590 as written criminalizes protected speech, Turney lists hypothetical statements he claims that statute criminalizes.[9] This effort is unavailing because it is the intent to influence the outcome that is critical. Whether such statements violate the statute turns on the intent of the utterer; a misguided or erroneous suggestion does not violate the statute absent the prohibited criminal intent.

In its amicus brief, the Alaska Civil Liberties Union (AkCLU) discusses several hypothetical situations regarding activity that it argues could be deemed to violate AS 11.56.590. For example, it contends that if FIJA ran TV ads with the purpose of inform-

---

**9.** According to Turney, AS 11.56.590 as written criminalizes the following statements:

Honey, if the case is so boring, why don't you just bring your knitting and concentrate on that until they get to the juicy parts?

What an honor to be chosen! I wish I could be on a jury. You must do your very best to be fair!

You're on jury duty? I don't care what the case is—hang 'em!

In my opinion, judges are all corrupt. You ought to try to figure out whatever it is that they're trying to keep from you.

ing residents of Fairbanks about jury nullification, and a prospective juror happened to watch those ads, the jury tampering statute would be violated. Such hypothetical situations do not illustrate any statutory overbreadth. None of AkCLU's examples involves a specific intention to influence how jurors decide a particular case. The State responds that AkCLU is incorrectly arguing that AS 11.56.590 does not require the State to prove a mens rea apart from the specific intent to influence a juror's actions. The State argues that the State must also prove that the defendant *knew* that he was communicating with a juror before he can be found guilty of jury tampering. The State argues that such knowledge is an historic requirement of the offense (citing, *e.g.*, *Commonwealth v. Riley*, 113 Pa.Super. 77, 172 A. 22, 24 (1934), and *Pettibone v. United States*, 148 U.S. 197, 206, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893)). In addition, a drafter assumes that, "under ordinary circumstance, the mental state of 'knowingly' must be proved with respect to the core conduct of each offense." *See, e.g., Johnson v. State*, 739 P.2d 781, 783–84 (Alaska App.1987). We agree.

■ Speech aimed at influencing the juror's conduct as a juror, i.e., the juror's execution of the responsibilities imposed by the trial court in a particular case, is not constitutionally protected. Justice Frankfurter noted that

> In securing freedom of speech, the Constitution hardly meant to create the right to influence judges or juries. That is no more freedom of speech than stuffing a ballot box is an exercise of the right to vote.

*Pennekamp v. Florida*, 328 U.S. 331, 366, 66 S.Ct. 1029, 1047, 90 L.Ed. 1295 (1946) (Frankfurter, J., concurring).

■ Other courts that have looked at the issue have also recognized that utterances involved in the obstruction of justice are not protected by the First Amendment. In rejecting an overbreadth and vagueness habeas challenge to a witness tampering statute, the federal district court in New Hampshire held that the defendant's interest in communicating with a potential witness with the intent to tamper was "minuscule" and outside the scope of First Amendment protection. *Kilgus v. Cunningham*, 602 F.Supp. 735, 739–40 (D.N.H.), *aff'd*, 782 F.2d 1025 (1st Cir.1985). The Florida Court of Appeals similarly concluded that "[e]fforts to influence a grand jury in its deliberations respecting specific matters under investigation by it are not shielded by the constitutional guarantee of free speech." *Dawkins v. State*, 208 So.2d 119, 122 (Fla.App.), *cert. denied*, 393 U.S. 854, 89 S.Ct. 101, 21 L.Ed.2d 123 (1968). In concluding that the presence of spectators wearing "Women Against Rape" buttons at a rape trial deprived the defendant of a fair trial, the Ninth Circuit noted that "[w]here fair trial rights are at significant risk … the first amendment rights of trial attendees can and must be curtailed at the courthouse door." *Norris v. Risley*, 918 F.2d 828, 831 (9th Cir.1990).

■ We conclude that because AS 11.56.590 is narrowly drawn and proscribes only speech intended to influence a juror in his or her capacity as a juror in a particular case, it does not reach speech protected by the First Amendment, and thus is not impermissibly overbroad.

In *Marks*, 500 P.2d at 647, this court discussed the limited circumstances in which certain categories of speech could be punished. The court gave several examples of speech that could be criminalized, because it was not within the protection of the First Amendment:

> For example, erotic speech might be punished as obscenity if the tests promulgated by the Supreme Court are met. Similarly, a person may be punished for uttering "fighting words" which are likely to provoke a violent reaction when addressed to an ordinary citizen or for intentionally provoking a crowd to hostile reaction under circumstances where a clear and present danger of immediate violence exists. *Presumably a state could also limit speech or assembly in specific places under limited circumstances, as, for example, in a courtroom while the court is in session.*

*Id.* (emphasis added). The emphasized language confirms that speech that affects the judicial process can be limited; it follows that

speech intended to subvert the jury's deliberations, and thus its verdict, can be prohibited.

We consequently hold that the jury tampering statute is not unconstitutionally overbroad.[10]

### C. *Is AS 11.56.590 Void for Vagueness?*

Turney next argues that AS 11.56.590 is void because it is unconstitutionally vague. As we said in *Marks* "the [void for vagueness] doctrine comes into play when the statutory language is so indefinite that the perimeters of the prohibited zone of conduct are unclear.... A vague statute violates the due process clause...." *Marks,* 500 P.2d at 646. "Vague laws in any area suffer a constitutional infirmity. When First Amendment rights are involved, we look even more closely lest, under the guise of regulating conduct that is reachable by the police power, freedom of speech or of the press suffer." *Gottschalk,* 575 P.2d at 294 (quoting *Ashton v. Kentucky,* 384 U.S. 195, 200, 86 S.Ct. 1407, 1410, 16 L.Ed.2d 469 (1966)).

The Supreme Court has noted that vagueness

> is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited.

*Colten v. Commonwealth of Kentucky,* 407 U.S. 104, 110, 92 S.Ct. 1953, 1957, 32 L.Ed.2d 584 (1972).

We have identified three factors to be considered in deciding whether a statute is unconstitutionally vague: (1) whether it is "so imprecisely drawn and overbroad that it 'chills' the exercise of [F]irst [A]mendment rights," (2) whether it gives adequate notice

of the conduct prohibited, and (3) whether imprecise language encourages arbitrary enforcement by allowing prosecuting authorities undue discretion to determine the scope of the statute's prohibitions. *Summers v. Anchorage,* 589 P.2d 863, 866–67 (Alaska 1979).

### 1. *Imprecision and overbreadth*

In context of the overbreadth prong, Turney argues that "AS 11.56.590 unconstitutionally criminalizes a wide range of protected speech; in doing so the statute necessarily does discourage such speech, chilling the exercise of Alaskans' [F]irst [A]mendment rights." We have previously acknowledged that "the overbreadth and void-for-vagueness doctrines are related and, at least in the [F]irst [A]mendment area, not wholly separable...." *Marks,* 500 P.2d at 646 (footnote omitted).

Our review of AS 11.56.590, discussed above in Part III.B, convinces us that the statute is not unconstitutionally overbroad and does not chill the exercise of First Amendment rights. Our reading of the statute leads us to conclude that there is a reasonable relationship between the intended target of the statute—communications that are intended to influence the discharge of a juror's core duties but that are not permitted by applicable rules—and the words of the statute. In our view, the statute is not so imprecise that persons wishing to engage in constitutionally protected speech would be discouraged from doing so. The statute describes the prohibited conduct and required intent. It distinguishes between speech directed at the jurors who will decide a particular case and speech aimed at the general public. It conveys the notion that communications that could not be passed to jurors in accordance with the applicable rules, or that

---

10. Given our conclusion that the statute is not overbroad, we need not consider the State's alternative arguments. The State argues in the alternative that even assuming that the speech involved in jury tampering implicates the First Amendment, it nevertheless should be denied protection under the "clear and present danger" test. Next, the State contends that even assuming that such speech does not satisfy the "clear and present danger" test, the statute is still con-

stitutional because it "strikes a balance between [F]irst [A]mendment interests and society's interest in the impartial administration of justice." The State argues that the impartial administration of justice is a "compelling government interest" that justifies encroachment upon First Amendment rights, and that the jury tampering statute satisfies the "least restrictive alternative" test.

would be contrary to the substance of official communications with the jurors, are prohibited.

We also conclude that the perimeters of the zone of prohibited conduct are not significantly broader than the core conduct that the legislature legitimately sought to prohibit. Because the conduct must be accompanied by the intent specified by the statute, there is a correlation between the words of the statute and the constitutionally unprotected conduct.

We consequently conclude that the statute is not so imprecisely drawn and overbroad that it chills exercise of First Amendment rights. *Cf. Summers*, 589 P.2d at 866.

### 2. *Adequate notice of conduct prohibited*

In order for a statute to give adequate notice, its terms

> must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties ... and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.

*Marks*, 500 P.2d at 650 (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391, 46 S.Ct. 126, 127–28, 70 L.Ed. 322 (1926)).

Turney argues that the phrases "influence the juror's ... action as a juror" and "directly or indirectly communicates" are not suffi-ciently explicit, and that "[i]t is not just a lay person who is impelled by AS 11.56.590 to grope for a constitutional meaning" of the statute.[11]

The State rejects this argument, stating that the term "influence" is not inherently vague, and draws parallels to the use of that term in Rules 3.5 and 3.10 of the Alaska Rules of Professional Conduct.[12]

■ We agree with the State. Reading the statute as a whole in light of the specific intent that is part of the offense, persons of common intelligence would not have to guess at its meaning and differ as to its application. *Marks*, 500 P.2d at 650 (quoting *Connally*, 269 U.S. at 391, 46 S.Ct. at 127–28).

■ Our court of appeals has often noted that a requirement of specific intent will save statutes from claims of unconstitutional vagueness. *McKillop v. State*, 857 P.2d 358, 364–65 (Alaska App.1993) (rejecting a constitutional challenge to Alaska's harassment statute in part because it required proof of specific intent); *Jones v. Anchorage*, 754 P.2d 275, 278–79 (Alaska App.1988) (upholding City's telephonic harassment ordinance because it required proof of specific intent to harass); *Flink v. State*, 683 P.2d 725, 733 (Alaska App.1984) (holding that the criminal statutes at issue involved specific intent crimes and were therefore neither vague nor overbroad). Courts elsewhere have rejected vagueness attacks for similar reasons.[13]

---

**11.** Turney cites *State v. Robertson*, 241 La. 249, 128 So.2d 646 (1961), in support of his argument. That case involved a jury tampering statute struck down for unconstitutional vagueness. The Louisiana Supreme Court concluded that the verb "to influence," as it appeared in the statute, "is susceptible of an extended application which defies legal measurement." *Id.* at 649. However, the State correctly distinguishes this case, as the actus reus in the Louisiana statute was "influencing," while the actus reus in the statute at issue here is "communicating."

**12.** Rule 3.5(a) provides that:
A lawyer shall not:
(a) *seek to influence* a judge, juror, prospective juror or other official by means prohibited by law.
(Emphasis added.)
Rule 3.10 provides:
After discharge of the jury from further consideration of a case with which the lawyer was connected, the lawyer shall not ask questions of or make comments to a member of that jury that are calculated merely to harass or embarrass the juror *or to influence the juror's actions in future jury service.*
(Emphasis added.)

**13.** *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir.1996) (concluding that "[a] scienter requirement ... may suffice to provide adequate notice that given conduct is proscribed"); *Kilgus v. Cunningham*, 602 F.Supp. 735, 740 (D.N.H. 1985) (rejecting defendant's vagueness and overbreadth challenges to witness tampering statute, and noting that "the statute focuses on the defendant's intent"); *State v. Cavallo*, 200 Conn. 664, 513 A.2d 646, 651 (1986) (relying on specific intent to save witness tampering statute from vagueness challenge); and *State v. Torline*, 215 Kan. 539, 527 P.2d 994, 997 (1974) (rejecting vagueness challenge to obstruction of justice statute in part because of intent requirement).

In addition, this court and our court of appeals have often rejected claims of inadequate notice when the conduct at issue falls squarely within the "hard core" of conduct that is prohibited by the statute. *See, e.g., Peratrovich v. State,* 903 P.2d 1071, 1078 (Alaska App.1995); *Holton v. State,* 602 P.2d 1228, 1236 (Alaska 1979); *Taylor v. State,* 710 P.2d 1019, 1023 (Alaska App.1985). We have noted that:

> Courts have often recognized that the possibility of difficult or borderline cases will not invalidate a statute where there is a hard core of cases to which the ordinary person would doubtlessly know the statute unquestionably applies.

*Stock v. State,* 526 P.2d 3, 9 (Alaska 1974).

### 3. *Potential for arbitrary enforcement*

This court has stated that it "will not invalidate a statute on [vagueness] grounds unless there is some history of arbitrary or selective enforcement." *Holton,* 602 P.2d at 1237 (citation omitted).

Turney claims that "[n]ot only does AS 11.56.590 create undue prosecutorial discretion encouraging arbitrary enforcement, it has led to actual arbitrary enforcement." In support, he notes that no charges were brought against the makers of a recently-broadcast television program on jury nullification, or against anyone who put up political, commercial, or religious messages inside the court building, or against Turney himself for any other instances in which he communicated with jurors. He also argues that the State "has permitted one point of view to be expressed in the State Court and Office building, but censored the opposing point of view" by showing a video and distributing a handbook discussing jurors' duties during juror orientation.[14]

We agree with the State's response that there is no evidence that the television producers or pamphleteers had the requisite intent to influence jurors' actions as jurors in particular cases. Further, the materials presented during jury orientation are specifically permitted by Alaska Rule of Administration 15(a). We conclude that there is no evidence of a history of selective or arbitrary enforcement.[15]

Turney also argues that he should not bear the burden of proving specific instances of the State's failure to prosecute under this statute. The language of the statute is not so imprecise on its face that it obviously would encourage "arbitrary enforcement by allowing prosecuting authorities undue discretion to determine the scope of its prohibitions." *Summers v. Anchorage,* 589 P.2d at 867.

We conclude for these reasons that AS 11.56.590 is not void for vagueness.[16]

### D. *Can a Person Commit a Criminal Trespass on Public Property during Hours the Property Is Open to the Public?*

Turney was charged with two counts of criminal trespass in the first degree, in viola-

---

**14.** Turney argues that:

> Almost simultaneously with Turney's communications, and without authorization by any Rule of Court, the State itself was distributing on court premises the pamphlet entitled "Alaska Trial Jury Handbook" which tells jurors "No juror should be influenced by what he or she thinks the law should be or what the juror would like it to be," and was showing the "orientation video" which told jurors "I the judge decide questions of law, that is which law applies to the case. But only you are the judge of the facts." Jurors were exposed to only one side of this debate.

**15.** Regardless of the subjective intentions of persons posting or giving out documents on court premises, if those communications convey to jurors messages which if followed would cause jurors to act contrary to official instructions given them during their service, those documents must be removed.

**16.** The superior court read AS 11.56.590 restrictively to provide "a proper balance to Turney's right to free speech and the Sixth Amendment right to a fair trial." According to the superior court, "the intent provision of the jury tampering statute must be interpreted to prohibit communications with a juror only when the defendant's *primary* intent is to influence a juror's vote, opinion, decision, or other action as a juror *in a particular case.*" (Second emphasis added.) Given our conclusion that the statute as written is constitutional, we need not impose any "limiting construction" not implicit in the words of the statute. We consequently need not consider Turney's argument that the superior court erred by "rewriting" the statute.

tion of AS 11.46.320(a)(1). He argues that a person cannot commit the crime of criminal trespass on public property when that property is open to the public. He contends that, even assuming that he was on court property when he spoke to Jurors Flood and Ellis, he did not commit criminal trespass because "[t]he purpose for entry or remaining does not make the entry or remaining unlawful."

The criminal trespass statutes, AS 11.46.320(a) and AS 11.46.330(a), both provide that a person commits criminal trespass if he or she "enters or remains unlawfully" on premises, either with or without the intent to commit a crime on the land.[17] Alaska Statute 11.46.350(a)(2) provides that:

> (a) As used in AS 11.46.300–11.46.350, unless the context requires otherwise, "enter or remain unlawfully" means to
>
> . . . .
>
> (2) fail to leave premises or a propelled vehicle that is open to the public after being lawfully directed to do so personally by the person in charge.

In *Johnson v. State,* 739 P.2d 781, 783–84 (Alaska App.1987), the court of appeals held that this statute was not unconstitutionally vague. In that case, the question of whether criminal trespass occurred was based not on whether the location was public or private, but on whether the defendant had "license or privilege to utilize the premises." *Id.* at 783. Here the issue turns not on whether the trespass occurred on public property, but on whether Area Court Administrator Woods had authority to prohibit Turney from remaining on or entering onto that property for a specified purpose.

 We agree with the State's argument that Alaska's criminal trespass statutes do reach a trespass on public property during hours the property is open to the public.[18] The statutes do not distinguish between private and public property. The only distinc-

tion is whether the "person in charge" has authority to prevent a person from entering or remaining on that property, thus making it "unlawful" for them to be there.

 Assuming Woods had authority to direct Turney to leave (an issue not before us) because he had reason to believe Turney was engaging in acts constituting jury tampering, we reject Turney's argument that he could not be charged under AS 11.46.320(a).

## IV. CONCLUSION

We AFFIRM the superior court's order denying Turney's motion to dismiss the indictment and information, and REMAND for further proceedings.

---

17. AS 11.46.330(a) provides:

> A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully
> (1) in or upon premises; or
> (2) in a propelled vehicle.

18. The State argues that both AS 11.46.320(a) and .330(a) provide that "a person commits a criminal trespass if he 'fail[s] to leave premises or a propelled vehicle that is *open to the public* after being lawfully directed to do so personally by the person in charge.' " This language is actually contained in a definitional statute, AS 11.46.350(a)(2).