**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FRANK W. TURNEY,
                    *Petitioner,*

v.

MARGARET PUGH, Commissioner,
                    *Respondent.*

No. 03-35165

D.C. No.
CV-01-00010-JWS

OPINION

Appeal from the United States District Court
for the District of Alaska
John W. Sedwick, District Judge, Presiding

Argued and Submitted
February 17, 2005—Seattle, Washington

Filed March 15, 2005

Before: Betty B. Fletcher, Ronald M. Gould, Circuit Judges,
and Samuel P. King, District Judge.*

Opinion by Judge B. Fletcher

---

*Honorable Samuel P. King, Senior United States District Judge for the
District of Hawaii, sitting by designation.

**COUNSEL**

Mary C. Geddes, Assistant Federal Public Defender, Anchorage, Alaska, for the petitioner.

Douglas H. Kossler, Assistant Attorney General, Anchorage, Alaska, for the respondent.

**OPINION**

B. FLETCHER, Circuit Judge:

This case raises the perennially difficult issue of the proper balance between two of our society's most treasured guarantees: the fair administration of justice (including, most importantly, a defendant's right to a fair trial) and the right to freedom of expression. In this appeal from the denial of his petition for a writ of habeas corpus, petitioner Frank Turney alleges that the Alaska jury tampering statute under which he

was convicted is overbroad in violation of the First Amendment. As interpreted by the Alaska Supreme Court, the statute prohibits knowingly communicating with a juror, directly or indirectly, with the intent to influence the outcome of a specific case, unless such communication is permitted by the rules of the proceeding. We conclude that the Alaska Supreme Court has interpreted the statute narrowly enough that it does not reach a substantial amount of protected speech. We therefore affirm the denial of Turney's petition.

## I.  BACKGROUND

In July 1994, prior to the commencement of jury selection in the Alaska criminal case *State v. Hall* in Fairbanks, jury-nullification proponent Frank Turney approached three members of the venire in the courthouse and told them to call the toll-free number of the Fully Informed Jury Association. Some of the individuals Turney lobbied were wearing badges that identified them as jurors. At the time, a person calling the number Turney publicized, 1-800-TEL-JURY, would have heard the following message:

> Thank you for calling the Fully Informed Jury Association. FIJA is a nonprofit educational association that wants all Americans to know their rights as jurors to judge the law itself as well as the facts regardless of the instructions from the judge because jurors cannot be punished for their verdict. They are the final check and balance on our government, with more power than the President, Congress, or the Supreme Court. To talk to a live person, call 406-793-5550 or we will mail you more free information on jury veto power, if you tell us how you heard of us. Then name and spell your name, address, and zip code. Here's the tone. [TONE]

Juror Ellis, one of the individuals Turney approached, was selected for the petit jury in *State v. Hall*. At one point during

deliberations, Ellis announced to the other jurors that he had called 1-800-TEL-JURY and that he was changing his vote in the case because "I can vote what I want." He urged the other jurors to call the number. The jury was unable to reach a decision and was excused.

Turney was subsequently indicted for three counts of jury tampering and charged by information with two counts of criminal trespass in the first degree. Alaska's jury tampering statute provides:

> A person commits the crime of jury tampering if the person directly or indirectly communicates with a juror other than as permitted by the rules governing the official proceeding with intent to
>
> > (1) influence the juror's vote, opinion, decision, or other action as a juror; or
> >
> > (2) otherwise affect the outcome of the official proceeding.

Alaska Stat. § 11.56.590(a). A "juror" for purposes of this statute is "a member of an impanelled jury or a person who has been drawn or summoned to attend as a prospective juror." *Id.* § 11.56.900(3).

The superior court denied Turney's motion to dismiss the charges. The Alaska Supreme Court permitted an interlocutory appeal and affirmed the denial of Turney's motion to dismiss. *Turney v. State*, 936 P.2d 533, 545 (Alaska 1997). Holding that the jury tampering statute "proscribes only speech intended to influence a juror in his or her capacity as a juror in a particular case," and that such speech is unprotected, the court rejected Turney's overbreadth challenge to the law. *Id.* at 541.[1]

---

[1]The court also upheld the statute against a vagueness challenge and rejected Turney's argument that he fell outside the definition of criminal

Turney was convicted at trial of three counts of jury tampering. The court sentenced him to fourteen months on each count to run concurrently, with all but sixty days suspended, plus a $2,500 fine (mostly suspended), 160 hours of community service work, and six years of probation. On direct appeal, the Alaska Court of Appeals affirmed, in an unpublished opinion that rejected Turney's overbreadth and vagueness arguments as foreclosed by the Alaska Supreme Court's decision in the interlocutory appeal. One judge dissented. The Alaska Supreme Court denied Turney's petition for review.

In 2001, Turney petitioned the federal district court in Alaska for a writ of habeas corpus, which the court denied. According to the court, the Alaska Supreme Court's overbreadth decision was fully in accord with United States Supreme Court jurisprudence, which makes clear that attempts to interfere with the administration of justice by improperly influencing jurors are not entitled to First Amendment protection. The court also rejected Turney's vagueness challenge and his argument that his Sixth Amendment rights were violated because the jury was not presented with every element of the crime of jury tampering. The district court denied a certificate of appealability, but we granted one with respect to the question of whether Alaska's jury tampering statute is overbroad. We therefore have jurisdiction under 28 U.S.C. § 2253(a).

## II.   ANALYSIS

A district court's denial of habeas relief is reviewed de novo. *Beardslee v. Woodford*, 358 F.3d 560, 568 (9th Cir. 2004). A habeas petitioner under 28 U.S.C. § 2254 cannot

---

trespass. *See id.* at 542-45.

We discuss the Alaska Supreme Court's overbreadth holding in detail below.

obtain relief based on a claim adjudicated on the merits in state court unless

> the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The "clearly established Federal law" inquiry refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A state court decision is "contrary to" clearly established Supreme Court precedent where the court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is an "unreasonable application of" clearly established Supreme Court precedent where the court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

The "highly deferential standard for evaluating state-court rulings" reflects a respect for state courts as "part of a co-equal judiciary" and as "competent interpreters of federal law." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (citations and internal quotation marks omitted). Though we review the district court's decision de novo, we "cannot grant relief . . . by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter." *Yar-*

*borough v. Alvarado*, 124 S. Ct. 2140, 2150 (2004). Accordingly, for federal habeas relief to be granted, it is not enough that our independent review indicate that the state court decision was incorrect or clearly erroneous; the state court's application of clearly established Supreme Court precedent must be "objectively unreasonable." *Lockyer*, 538 U.S. at 75-76.

In applying the standards of 28 U.S.C. § 2254, the relevant state decision is the "last reasoned decision by a state court." *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004) (citation and internal quotation marks omitted). Here, because the Alaska Court of Appeals treated the overbreadth issue as settled by the Alaska Supreme Court on interlocutory review, it is the Alaska Supreme Court's decision whose conformity to federal law (under the deferential standard of § 2254(d)) is at issue.

**[1]** Under the doctrine of First Amendment overbreadth, a litigant may mount a facial attack on a statute that restricts protected speech even if the litigant's own speech is unprotected. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). The overbreadth must be substantial in order for the statute to be invalidated on its face; the fact that a court may conceive of a single impermissible application is insufficient to justify striking down the law. *City of Houston v. Hill*, 482 U.S. 451, 458 (1987).

When examining a law for overbreadth, a court's first task is to determine "whether the enactment reaches a substantial amount of constitutionally protected conduct." *Id.* (citation and internal quotation marks omitted). Where a state statute challenged for overbreadth has been construed by the state's highest court, the scope of the statute is to be assessed in light of the construction that court has given. *See Osborne v. Ohio*, 495 U.S. 103, 113 (1990).

The Alaska Supreme Court's decision in Turney's case provides a detailed analysis of the state's jury tampering statute.

Specifically, the court held that the statute prohibits only "communications intended to affect *how the jury decides a specific case*" where the speaker has "intent to *influence the outcome*" and *knows* he or she is communicating with a juror. *Turney*, 936 P.2d at 540-41 (emphasis added). As thus interpreted, the statute did not, in the court's view, reach speech protected by the First Amendment. *Id.* at 541. For example, because of the "particular case" requirement, the statute "would not reach institutional messages that are broadcast to the general public on such topics as the adverse effects of insurance fraud or the wisdom of tort reform." *Id.* at 540. The court dismissed the concern that the statute would unfairly sweep in an innocent person giving a juror general advice, such as "You must do your very to best to be fair," or expressing a generalized opinion to an juror, as in "You're on jury duty? I don't care what the case is — hang 'em!" Though the court did not deny that such statements could result in criminal liability, the court explained that "[w]hether such statements violate the statute turns on the intent of utterer." *Id.* at 540 & n.9. Finding that the statute as construed only reached speech aimed at influencing jurors, and that such speech is unprotected, the court held that the statute was not overbroad. *Id.* at 541.

**[2]** In light of the Alaska Supreme Court's opinion, the scope of the jury tampering statute can be described as follows: the law criminalizes *knowingly communicating with a juror, directly or indirectly, with the intent to influence the outcome of a specific case*, unless such communication is permitted by the rules of the proceeding. We must now determine whether this prohibition sweeps in a substantial amount of speech that is constitutionally protected.

The Supreme Court has developed robust protections for speech concerning judicial proceedings. In a line of cases beginning with *Bridges v. California*, 314 U.S. 252 (1941), the Court reversed a series of contempt convictions for disseminating editorials and other public commentary about

pending cases or grand jury investigations. *See id.* at 268-75 (reversing contempt convictions for publishing editorials, including one urging a judge to impose harsh punishment on two defendants facing sentencing); *Pennekamp v. Florida*, 328 U.S. 331, 336 & n.4, 349-50 (1946) (reversing contempt convictions for publishing editorials critical of pro-defendant rulings in criminal cases); *Craig v. Harney*, 331 U.S. 367, 369-70, 377-78 (1947) (reversing contempt convictions for publishing editorials criticizing a judge for directing a verdict in a particular case); *Wood v. Georgia*, 370 U.S. 375, 376-80, 395 (1962) (reversing the contempt conviction of a local sheriff for publicly denouncing a court's instruction to a grand jury to investigate "Negro bloc voting" in a Georgia county). As the Supreme Court recognized, restrictions on speech concerning pending judicial proceedings are likely to impede discussion of important public issues "at the precise time when public interest in the matters discussed would naturally be at its height." *Bridges*, 314 U.S. at 268. But "[n]o suggestion can be found in the Constitution that the freedom there guaranteed for speech and the press bears an inverse ratio to the timeliness and importance of the ideas seeking expression." *Id.* at 269.

**[3]** In these cases, the Court applied various versions of the then-evolving "clear and present danger" test to evaluate restrictions on speech concerning judicial proceedings. *See id.* at 271 (assessing "to what extent the substantive evil of unfair administration of justice was a likely consequence" of publication of the articles in question, and "whether the degree of likelihood was sufficient to justify summary punishment"); *Pennekamp*, 328 U.S. at 348 (assessing whether publications created "a clear and present danger to the fair administration of justice"); *Harney*, 331 U.S. at 378 (assessing whether publications created "an imminent and serious threat to the ability of the court to give fair consideration" to pending matters); *Wood*, 370 U.S. at 384-85 (following *Bridges*, *Pennekamp*, and *Craig*). In light of the subsequent evolution of the clear and present danger test, it can be extrapolated that, as a gen-

eral rule, speech concerning judicial proceedings may be restricted only if it "is directed to inciting or producing" a threat to the administration of justice that is both "imminent" and "likely" to materialize. *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam) (setting forth the successor to the clear and present danger test applied in its various incarnations in the *Bridges-Wood* line of cases).

**[4]** However, speech to jurors about pending cases presents a special problem because of its grave implications for defendants' right to a fair trial and the public's interest in fair and impartial justice. In *Remmer v. United States*, 347 U.S. 227 (1954), for example, the Supreme Court vacated the conviction of a defendant whose jury foreman was told by an unnamed person that he could profit by ensuring an acquittal. *Id.* at 228, 230. The Court set forth this broad rule: "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*" unless made pursuant to court rules or other instructions. *Id.* at 229 (emphasis added). In *Sheppard v. Maxwell*, 384 U.S. 333 (1966), the Supreme Court found that habeas relief was warranted for a defendant tried and convicted in a "carnival atmosphere," *id.* at 358, created by "inherently prejudicial publicity which saturated the community," *id.* at 363. The Court explained: "The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence . . . ." *Id.* at 351 (citation and internal quotation marks omitted). In fact, "[d]ue process *requires* that the accused receive a trial by an impartial jury free from outside influences." *Id.* at 362 (emphasis added).

Even in the strongly speech-protective decisions of the *Bridges-Wood* line, the Court was careful to distinguish the publications it deemed protected under the First Amendment from speech aimed at improperly influencing jurors. As the Court observed in *Bridges*: "The very word 'trial' connotes

decisions on the evidence and arguments properly advanced in open court. Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." 314 U.S. at 271. Thus, in *Wood v. Georgia*, while the Court held that the First Amendment protected a sheriff's public criticism of a pending grand jury investigation, the Court stressed that the speech at issue there "[did] not represent a situation where an individual is on trial; there was no 'judicial proceeding pending' in the sense that prejudice might result to one litigant or the other by ill-considered misconduct aimed at influencing the outcome of a trial." *Wood*, 370 U.S. at 389. The majority concluded that it "need not pause . . . to consider the variant factors that would be present in a case involving a petit jury"; in *Wood*, as in *Bridges*, *Pennekamp*, and *Harney*, a jury trial was not implicated. *Id.*

[5] Reading all of these cases together leads us to conclude that the First Amendment, while generally quite protective of speech concerning judicial proceedings, does not shield the narrow but significant category of communications to jurors made outside of the auspices of the official proceeding and aimed at improperly influencing the outcome of a particular case. What Alaska's jury tampering statute covers in the main, then, is speech that is not protected by the First Amendment.

Turney urges us to apply *Brandenburg* and hold that the State may not proscribe speech to jurors unless it is likely imminently to undermine the administration of justice. But the Supreme Court has never applied any version of the clear and present danger test to communications made knowingly to jurors with the intent to influence the outcome of a specific case. On the contrary, as we have observed, the Court has expressly distinguished such communications from the speech it has protected under the First Amendment and as a general matter has demonstrated little tolerance for improper communications with jurors. Thus the fact that the Alaska Supreme Court declined to apply *Brandenburg* to the jury tampering

statute did not render that court's decision "contrary to" Supreme Court precedent.

**[6]** Despite its primary focus on unprotected speech, the Alaska statute is nonetheless overbroad if it covers a substantial amount of protected speech. "[T]he possible harm to society in permitting some unprotected speech to go unpunished is outweighed by the possibility that protected speech of others may be muted . . . ." *Broadrick*, 413 U.S. at 612. In his dissent from the affirmance of Turney's conviction on direct appeal, Alaska Court of Appeals Judge Mannheimer argued that, in spite of the state supreme court's limiting construction, the statute would still criminalize two substantial categories of protected speech: innocent advice to jurors and political demonstrations outside a courthouse.

With respect to the first example, it is doubtful that the statute as construed by the Alaska Supreme Court sweeps as broadly as Judge Mannheimer fears. In his dissent, Judge Mannheimer posited a detailed hypothetical in which a juror is told by her daughter to avoid reading the newspaper so she does not encounter publicity about the case on which she is serving as a juror, the juror's husband advises her to contact the police after she receives a threatening phone call, and a police officer instructs the juror to notify the trial judge of the phone call. Judge Mannheimer contended that all three of these contacts would be criminal under Alaska's jury tampering statute because all three speakers communicated with the juror, knowing she was a juror, with the intent to influence her actions as a juror in a particular case.

We disagree with Judge Mannheimer's analysis of this hypothetical, because one element of the statute (as construed) is not met: the intent to influence the *outcome* of a particular case. None of the three innocent jury communications posited by Judge Mannheimer is "intended to affect *how the jury decides* a specific case." *Turney*, 936 P.2d at 540 (emphasis added); *see also id.* ("[I]t is the intent to influence

the outcome that is critical."). Thus the fear that Alaska has criminalized many innocent conversations with jurors is exaggerated; under the Alaska Supreme Court's interpretation, the statute will rarely reach such conversations because the speaker will rarely possess the requisite intent.

Judge Mannheimer's second example — political demonstrators, situated immediately outside a courthouse, shouting to everyone approaching the courthouse fervent opinions about the guilt or innocence of the defendant being tried inside — raises challenging questions about the proper balance between due process and freedom of expression. But we need not engage in the difficult task of balancing fundamental rights with respect to courthouse demonstrations, because the Supreme Court already has.

In *Cox v. Louisiana*, 379 U.S. 559 (1965), the Supreme Court considered the case of a man prosecuted for his involvement in a demonstration in front of a courthouse to protest the arrest of a group of students the previous day. *Id.* at 564-65. Though the Court reversed the defendant's conviction on due process grounds, *see id.* at 568-71, it refused to invalidate the statute under which he was convicted. The statute read:

> Whoever, with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty pickets or parades in or near a building housing a court of the State of Louisiana shall be fined not more than five thousand dollars or imprisoned not more than one year, or both.

*Id.* at 560 (citation, internal quotation marks, and ellipsis omitted). Finding the statute to be "narrowly drawn to punish specific conduct that infringes a substantial state interest in

protecting the judicial process," the Supreme Court rejected a facial challenge to the law. *Id.* at 564.

**[7]** While Alaska's statute is directed at a different set of communications than the Louisiana statute at issue in *Cox*, the former is no broader in its applicability to courthouse demonstrations than the latter. In fact, the Alaska statute's applicability to courthouse demonstrations is more limited than that of the Louisiana statute, as the Alaska law reaches only communications made *to a juror* with the intent *to influence the outcome of a particular case*, as opposed to all communications made "with the intent of interfering with, obstructing, or impeding the administration of justice, or with the intent of influencing any judge, juror, witness, or court officer, in the discharge of his duty." *Id.* at 560 (citation and internal quotation marks omitted). Since the impact of the Louisiana statute on courthouse demonstrations did not render it facially unconstitutional, the Alaska statute's narrower impact on this class of speech probably does not render the Alaska statute facially unconstitutional either. The Alaska Supreme Court's rejection of Turney's overbreadth challenge was therefore not an objectively unreasonable application of *Cox*.

**[8]** A third area in which Alaska's statute could intrude into the realm of protected expression is the mass publication of political ideas. For example, the terms of the statute could be construed to apply to a person who takes out a newspaper or television advertisement supporting a particular outcome in a pending case (e.g., "OJ Was Framed!"). The ad is an indirect communication with the newspaper's or television station's entire audience. If that audience includes a juror in the case, the purchaser of the ad has communicated with a juror, other than as permitted by the rules of the proceeding, with the intent of influencing the outcome of a specific case.

**[9]** The Alaska Supreme Court has specifically addressed our concerns on this score. The court observed that the statute's implied scienter requirement would prevent application

of the statute to mass communications of this type, because the speaker would have to *know* that she or he was communicating with a juror in order to be guilty of jury tampering. *Turney*, 936 P.2d at 541. Once again, the Alaska Supreme Court's construction of the statute has narrowed its reach so that it does not sweep in a substantial amount of protected speech.

**[10]** It is possible that Alaska's jury tampering statute may cover one or two instances of constitutionally protected speech to jurors. But a law may not be held invalid on its face "merely because it is possible to conceive of a single impermissible application." *Hill*, 482 U.S. at 458 (citation and internal quotation marks omitted). The parties and state opinions in this case have identified only one swath of protected speech that the statute (as construed by the Alaska Supreme Court) could reach — political demonstrations at a courthouse about trials occurring therein — and the U.S. Supreme Court in *Cox* rejected a facial challenge to a statute that impinged upon such speech to a broader degree. We have not been able to identify any other applications of the Alaska statute that would reach a substantial amount of constitutionally protected speech. We must therefore conclude that it was not objectively unreasonable for the Alaska Supreme Court to hold that the jury tampering statute, as construed, is not overbroad in violation of the First Amendment.

### III.  CONCLUSION

When government restricts the expression of ideas, alarm bells should sound for all of us. The freedom of speech — including both a speaker's freedom to convey an idea, and a listener's freedom to receive it — is at the heart of the protections that our Constitution guarantees so that our society may remain a free one. The fact that judicial proceedings can be sensitive and controversial does not diminish the importance of vigorous national debate on matters concerning the administration of justice.

But our courts will be unable to carry out their vital functions — including the weighty task of enforcing the guarantees of our Constitution — if jurors are not insulated from influences that could undermine their ability to decide the cases before them fairly and impartially. "Due process requires that the accused receive a trial by an impartial jury free from outside influences." *Sheppard*, 384 U.S. at 362.

**[11]** The Alaska Supreme Court has carefully narrowed the state's jury tampering statute so that it operates in service of the latter constitutional command without substantially impinging on the former. Given this construction, the Alaska Supreme Court's conclusion that the jury tampering statute is not overbroad in violation of the First Amendment was not "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). We therefore affirm the district court's denial of habeas relief.

**AFFIRMED.**