2000 SD 56

**STATE of South Dakota, Plaintiff and Appellant,**

v.

**Debra Kay SPRINGER–ERTL, Defendant and Appellee.**

No. 20723.

Supreme Court of South Dakota.

Argued Oct. 20, 1999.

Reassigned Jan. 6, 2000.

Decided April 26, 2000.

Mark Barnett, Attorney General, Craig M. Eichstadt, Deputy Attorney General, Pierre, for plaintiff and appellant.

Pamela K. Ireland, Kadoka, for defendant and appellee.

KONENKAMP, Justice (on reassignment).

[¶ 1.] The State of South Dakota appeals the grant of a new trial to the defendant. We affirm.

### A.

[¶ 2.] The defendant, Kay Springer–Ertl, is the mother of Shawn Springer. Sixteen-year-old Shawn and another juvenile were charged with the January 26, 1996, murder, kidnapping, and robbery of taxicab driver Michael Hare near Fort Pierre, Stanley County, South Dakota. Extensive publicity convinced the judge to move Shawn's trial to Martin in Bennett County. It was scheduled to begin on August 5, 1996.

[¶ 3.] Two weeks before her son's trial date, the defendant created multiple copies of an 8½ × 11 inch laminated poster. In large letters at the top, the poster declared: **INNOCENT!!** Beneath was a photograph of a smiling young man, with a caption identifying him and his hometown. Below that was the message:

> **Shawn Springer** is accused in the murder, kidnapping and robbery of Michael Hare, a Pierre taxicab driver.
>
> Shawn took a **_Polygraph_** (lie detector test) and this **_proved_** he knew nothing beforehand of the events that took place that night, or that he took part. The court **_will not_** allow this evidence into trial. The people of South Dakota must know an innocent young man is being **_persecuted_**. **_Shawn's_** trial starts **_August 5_** TH **_1996._**

(emphasis in original).

[¶ 4.] On July 20, 1996, the defendant, her husband, and her oldest son drove to Martin. They rented a motel room and the defendant set about distributing her posters. She approached various businesses in town, asking each to display one. Most agreed. Some of the businesses were closed, so she hung the posters on their windows. On her way out of town on July 21, she also deposited posters on

some vehicles outside a church. In total, she distributed approximately thirty. No posters were distributed in any other community but Martin.

[¶ 5.] On July 22, Agent Gortmaker. of the South Dakota DCI and a detective from Minnesota contacted the defendant at her home in Marshall, Minnesota. As they sat at her kitchen table, the defendant, in response to the officers' questions, admitted to circulating the posters, saying she "wanted people to know about the polygraph and the polygraph results." Within forty-eight hours, a number of the posters had been seized by law enforcement officers. Many others had been discarded by the business owners. Nonetheless, the judge, perceiving that the jury pool had been contaminated, postponed the trial. Shawn later pleaded guilty under a plea bargain.

[¶ 6.] The defendant's poster was not addressed to anyone in particular. It could not have been directed specifically to any juror because no prospective jurors had been summoned. One hundred fifty persons had been "drawn" from the county master list, but no one had yet been called for duty on Shawn's case. According to Linda Larson, the Bennett County Clerk of Courts, prospective jurors for the August 5 trial would not have been summoned until ten days beforehand. Because the trial was later cancelled, no jurors were ever summoned.

[¶ 7.] The defendant was charged with three counts of attempting to influence jurors under SDCL 22–11–16, a Class 6 felony, each offense punishable by a maximum of two years imprisonment in the state penitentiary or a fine of two thousand dollars, or both.[1] SDCL 22–6–1(8).

After a preliminary hearing, the defendant was bound over to circuit court to stand trial. Upon the arraignment, however, the circuit court dismissed the information and the State appealed. We reversed because after the case was bound over, the circuit court did not have authority to dismiss an information for lack of probable cause. The case was remanded for trial. *See State v. Springer-Ertl,* 1997 SD 128, 570 N.W.2d 39.

[¶ 8.] Crucial to imposing criminal penalties under SDCL 22–11–16 is a finding that the accused attempted "to influence a juror, or any person summoned or drawn as a juror[.]" At trial, the defendant repeatedly denied any intent to influence jurors. In finding her guilty of Count 2, a violation of SDCL 22–11–16(2), the jury apparently concluded that because she distributed her posters only in the town of Martin, she did intend to influence people "drawn" as potential jurors. After the verdict, the court granted the defendant a new trial. As the poster was publicly distributed, the judge reasoned, the jury should have been advised on what distinguishes the crime of attempting to influence jurors from protected speech under the First Amendment.

## B.

[¶ 9.] Granting a new trial lies within a court's discretion and that discretion will not be overridden unless it is abused. *Delzer v. Penn,* 534 N.W.2d 58, 60 (S.D.1995) (quoting *Fullmer v. State Farm Ins. Co.,* 498 N.W.2d 357, 361 (S.D. 1993) (citation omitted)). We require a clearer showing of abuse of discretion when a new trial was granted than when it was denied. *Id.* (quoting *Fullmer,* 498

---

1. The full text of SDCL 22–11–16 provides:

Any person who attempts to influence a juror, or any person summoned or drawn as a juror, or chosen an arbitrator or appointed a referee, in respect to his verdict or decision in any cause or matter pending, or about to be brought before him: ·

 (1) By means of any communication, oral or written, had with him, except in the regular course of proceedings upon the trial of the cause;

 (2) By means of any book, paper or instrument exhibited otherwise than in the regular course of proceedings upon the trial of the cause; or

 (3) By publishing any statement, argument or observation relating to the cause;

is guilty of a Class 6 felony.

N.W.2d at 361 (citation omitted)). Trial courts are empowered under SDCL 15-6-59(a)(7) to grant a new trial for errors made in trial. In granting the defendant's new trial motion, the court cited its own error in failing to include jury instructions on freedom of speech under the United States Constitution and the Constitution of the State of South Dakota. The State argues that the defendant was not entitled to such instructions.[2] In the State's view, government may regulate public expression to assure that the administration of justice is free from outside control and influence. Speech intended to influence jurors, the State contends, is constitutionally unprotected, and because the jury found that the defendant did intend to influence potential jurors, the First Amendment avails her nothing.

### C.

[¶ 10.] This is no ordinary jury tampering case. Jurors were not solicited directly or approached indirectly through an intermediary. On the contrary, the defendant was charged with attempting to influence one or more unidentified persons drawn but never summoned for jury service. Her attempt, the State asserts, was consummated by simply putting up her posters. Neither side cites us to any case with even remotely similar facts. More typical are cases like *United States v. Ogle*, 613 F.2d 233 (10th Cir.1979), where the perpetrator had an acquaintance offer to give a juror a copy of his jury nullification pamphlet. Most offenses are committed directly, when, as in United States v. Jackson, the defendant approached two venirepersons and told them that a friend was on trial and the "federal boys are trying to railroad" the friend, and to listen for the word "harassment." *United States v. Jackson*, 607 F.2d 1219, 1220 (8th Cir.1979), *cert. denied*, 444 U.S. 1080, 100 S.Ct. 1032, 62 L.Ed.2d 763 (1980).

[¶ 11.] The defendant's poster approaches fully protected political speech because it was couched as public criticism of the government in its handling of a criminal prosecution. "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838, 98 S.Ct. 1535, 1541, 56 L.Ed.2d 1, 10 (1978) (quoting *Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484, 488 (1966)). Government, including courts and judges, possess "no greater immunity from criticism than other persons or institutions." *Id.* at 839, 98 S.Ct. at 1541, 56 L.Ed.2d at 10 (citation omitted). Americans hold the prerogative to "criticize public men and measures—and that means not only informed and responsible criticism, but the freedom to speak foolishly and without moderation." *Baumgartner v. United States*, 322 U.S. 665, 674, 64 S.Ct. 1240, 1245, 88 L.Ed. 1525, 1531 (1944).

[¶ 12.] Here, the criticism was focused in one small community where a trial was about to begin. Yet no poster was submitted directly to any juror whose name had been drawn, not even covertly by posting one at a place, such as the courthouse, where only jurors and court personnel would most likely see it. Concededly, the defendant can hardly be char-

---

**2.** The defendant's proposed instruction stated:
Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances.
This is inadequate, as it simply recites the applicable passages of our state and federal constitutions. But as we have never before construed our jury tampering statute, much less given it a narrowing interpretation, the defendant cannot be faulted too critically for not proposing a more precise instruction.

acterized as a concerned citizen who was expressing a conventional grievance. But the First Amendment protects speech even if biased or improperly motivated. *See First Nat'l Bank of Boston v. Bellotti,* 435 U.S. 765, 776–77, 98 S.Ct. 1407, 1415–16, 55 L.Ed.2d 707, 717 (1978); *Eastern RR Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 139, 81 S.Ct. 523, 530, 5 L.Ed.2d 464, 472 (1961). If freedom of speech insulated comments only from those whose motives were pure, it would protect very little. A democracy relies on its citizens to judge and evaluate "the relative merits of conflicting arguments." *Bellotti,* 435 U.S. at 792, 98 S.Ct. at 1424, 55 L.Ed.2d at 727.

[¶ 13.] The poster's vice was that it revealed to the community where the case was about to be tried what the court ordered excluded from the trial. No gag order, however, barred the defendant from revealing this information. In her trial, the State offered no evidence that any prospective juror ever saw or even heard of her poster. In closing argument, nonetheless, the prosecutor told the defendant's jury that the poster was "illegal" and "it does not matter if one or two or fifty of the jurors, or none of them that were on the panel saw that poster. It is the attempt to influence that causes the problem." As the State never identified any prospective juror who saw or heard about the defendant's poster, whoever in particular was the target of the defendant's "influence" remains to this day unnamed and unknown.

[¶ 14.] Our inquiry is not whether polygraph exams are admissible in court. Nor is the decision excluding such evidence at issue. Rather, what is noteworthy is that the polygraph result the defendant's son obtained was a matter of public record, as the exam and its results were the subject of a public hearing in the son's case. That hearing resulted in a court order excluding the test result. Anyone sitting in the courtroom at the time this evidentiary issue came up would have heard about it.

In fact, the prosecution did not dispute the defendant's contention at trial that nearly the same information had been related in statewide media reports; namely, that the court had excluded Shawn's polygraph result in the upcoming trial. Thus, the defendant was convicted of attempting to influence a jury by disclosing in public, information about her son that was a matter of public record.

[¶ 15.] Court proceedings are public proceedings with few exceptions, and what happens in court abides in the public domain: "Those who see and hear what transpired can report it with impunity." *Craig v. Harney,* 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546, 1551 (1947). In *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976), the United States Supreme Court held that to prohibit press commentary on evidentiary issues, a state must show that "further publicity, unchecked, would so distort the views of potential jurors that 12 could not be found who would, under proper instructions, fulfill their sworn duty to render a just verdict exclusively on the evidence presented in open court." *Id.* at 569, 96 S.Ct. at 2807, 49 L.Ed.2d at 703. "Truthful reports of public judicial proceedings have been afforded special protection against subsequent punishment." *Id.* at 559, 96 S.Ct. at 2803, 49 L.Ed.2d at 698. Although it was argued that the poster sought to give prospective jurors information they would not have heard in the trial, the poster did not itself advocate or incite any unlawful conduct. Here we have the inverse of what Justice Scalia decried in another First Amendment case: the State imposes a prohibition on the individual that it is unprepared to impose on the press. *Florida Star v. B.J.F.,* 491 U.S. 524, 542, 109 S.Ct. 2603, 2614, 105 L.Ed.2d 443, 461 (1989) (Scalia, J., concurring). As the defendant said to the jury in her trial, "if the paper can write that stuff, why can't I[?]"

## D.

[¶ 16.] We face a conflict of fundamentals: free expression versus impartial justice. In our inquiry, we must acknowledge that the First Amendment deserves overarching primacy in most circumstances. Free speech cannot be generally circumscribed, except in restricted settings. *United Mine Workers v. Illinois Bar Ass'n,* 389 U.S. 217, 223, 88 S.Ct. 353, 356–57, 19 L.Ed.2d 426, 431 (1967). Where the right of free speech exists, it is "immaterial whether the beliefs sought to be advanced ... pertain to political, economic, religious or cultural matters...." *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488, 1498–99 (1958). Freedom of speech, indispensable to our democratic form of government, acts as a deterrent to the abuse of power. If government can conduct arrests and prosecutions free from public scrutiny, then fertile ground opens for oppression.

[¶ 17.] Freedom of expression, however, is not absolute. It was never meant "to give immunity for every possible use of language." *Frohwerk v. United States,* 249 U.S. 204, 206, 39 S.Ct. 249, 250, 63 L.Ed. 561, 564 (1919) (citation omitted). *See State v. Hauge,* 1996 SD 48, ¶ 10, 547 N.W.2d 173, 176. One is not free, for example, to send threatening or harassing letters. *Id.* ¶¶ 9–10. Nor has anyone the right to make obscene telephone calls. *State v. Crelly,* 313 N.W.2d 455, 457 (S.D. 1981). First Amendment freedoms must yield to other essential values lest they be polluted and poisoned. *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 501, 101 S.Ct. 2882, 2889, 69 L.Ed.2d 800, 810 (1981).

[¶ 18.] To preside effectively, courts must control the process to keep internal order and permit only admissible evidence. A fair trial would be impossible if jurors were beset with disclosures from beyond the courtroom. As Justice Holmes explained almost a century ago, "[t]he theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado,* 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907). To prevent interference with the conduct of trials, the United States Supreme Court declared: "A State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." *Cox v. Louisiana,* 379 U.S. 559, 562, 85 S.Ct. 476, 480, 13 L.Ed.2d 487, 491 (1965).

[¶ 19.] In *Cox,* the Court upheld, in dicta, a statute that prohibited picketing near a courthouse. *Id.* at 560, 564, 85 S.Ct. at 478–79, 481, 13 L.Ed.2d at 492. In so finding, the Court stated:

> A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.
>
> Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute—picketing and parading—is subject to regulation even though intertwined with expression and association.

*Id.* at 562–63, 85 S.Ct. at 480, 13 L.Ed.2d at 491. The Court explained: "[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 563, 85 S.Ct. at 480, 13 L.Ed.2d at 491–92 (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834 (1949)). Picketers and paraders shouting and chanting beneath the courtroom window depict a spectacle wholly inimical to a reasoned and impartial rendering of justice.

[¶ 20.] All the same, the Court in *Cox* was careful to specify that it dealt "not

with free speech alone, but with expression mixed with particular conduct." *Id.* at 564, 85 S.Ct. at 480, 13 L.Ed.2d at 492. Here, the only act the State seeks to punish is the act of public communication. *Cox* upheld a statute prohibiting expression at a very particular location—a courthouse and its immediate perimeter. Left unprohibited was delivery of the same message by different method or even by the same method at a different place. *See* G.R. Stone, L.M. Seidman, C.R. Sunstein, M.V. Tushnet, The First Amendment 66 (1999). "There can be no question that a State has a legitimate interest in protecting its judicial system from the pressures which picketing near a courthouse might create." *Cox,* 379 U.S. at 562, 85 S.Ct. at 479, 13 L.Ed.2d at 491. How limited the location of prohibited expression may be was perhaps intimated two decades later in *United States v. Grace,* 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), when the Supreme Court struck down a federal law prohibiting display of flags, banners, or devices on the public sidewalks around the Supreme Court building. The government's right to restrict expression in such places, the Court held, is "very limited." *Id.* at 177, 103 S.Ct. at 1707, 75 L.Ed.2d at 743.

[¶ 21.] Restrictions on the freedom of speech may burden no more speech than necessary to fulfil proper government purposes. *Schenck v. Pro–Choice Network of Western New York,* 519 U.S. 357, 380, 117 S.Ct. 855, 868, 137 L.Ed.2d 1, 23 (1997). "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp v. Florida,* 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295, 1303–04 (1946). For the most part, the defendant's posters were placed in storefronts, visible from the sidewalk. "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public

sidewalks, a prototypical example of a traditional public forum." *Schenck,* 519 U.S. at 377, 117 S.Ct. at 867, 137 L.Ed.2d at 21 (citing *Boos v. Barry,* 485 U.S. 312, 322, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333, 345–46 (1988); *Grace,* 461 U.S. at 180, 103 S.Ct. at 1708–09, 75 L.Ed.2d at 745–46 (other citations omitted)). Americans have long maintained the right to challenge and criticize government in its handling of affairs, including the arrests and trials of those charged as criminals. *See, e.g., City of Houston v. Hill,* 482 U.S. 451, 462–63, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398, 412–13 (1987). Indeed, the freedom to speak in opposition to acts of law enforcement is "one of the principal characteristics by which we distinguish a free nation from a police state." *Id.*

### E.

[¶ 22.] While the Supreme Court's decision in *Gentile* is not precisely on point because the public and the press have fewer speech restrictions than lawyers participating in judicial proceedings, it is well for us to consider the accused attorney's remarks in that controversy. *See Gentile v. State Bar of Nevada,* 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991). There, an attorney held a press conference announcing after his client's arrest that "the State sought the indictment and conviction of an innocent man as a 'scapegoat' and had not 'been honest enough to indict the people who did it; the police department, crooked cops.'" *Id.* at 1034, 111 S.Ct. at 2724, 115 L.Ed.2d at 897–98. In our case, the defendant's alleged motive is almost identical to the admitted motive the lawyer gave in *Gentile* :

[H]is primary motivation was the concern that, unless some of the weaknesses in the State's case were made public, a potential jury venire would be poisoned by repetition in the press of information being released by the police and prosecutors, in particular the repeated press reports about polygraph tests and

the fact that the two police officers were no longer suspects. *Id.* at 1042, 111 S.Ct. at 2728, 115 L.Ed.2d at 903. The lawyer "sought only to stop a wave of publicity he perceived as prejudicing potential jurors against his client and *injuring his client's reputation in the community*." *Id.* at 1043, 111 S.Ct. at 2728, 115 L.Ed.2d at 903 (emphasis added). Here, the defendant never conceded that she wanted to influence potential jurors, but like Gentile, she testified, "I felt that public opinion was being tainted. I wanted to try to get it on a balanced level. It was tainted by the newspaper, the TV, the radio. I just wanted to try to balance it out some way." The only material difference between this case and *Gentile* is that in *Gentile* the lawyer did not disseminate what was already public record.

■ [¶ 23.] Gentile's public comments could not be used as a basis to punish him because Nevada's prohibition against such remarks was so vague that it risked the potential for discriminatory enforcement. The *Gentile* Court observed that the Nevada Supreme Court had never given a clarifying interpretation of the ethics rule governing attorney comments. A lawyer's statements on a pending case, the Court held, may be regulated without violating the First Amendment, if there is a "substantial likelihood of material prejudice" in the adjudicative process. *Id.* at 1074–75, 111 S.Ct. at 2745, 115 L.Ed.2d at 923. Lawyers representing clients in court are not protected by the First Amendment to the same extent as the public. *Id.* at 1073, 111 S.Ct. at 2744, 115 L.Ed.2d at 922. Regulation of public or media speech during pending proceedings, on the other hand, can only be justified by a "clear and present danger" of "actual prejudice or an imminent threat" of "some serious substantive evil which they are designed to avert." *Id.* at 1069, 111 S.Ct. at 2742, 115 L.Ed.2d at 919–20 (citing *Nebraska Press Ass'n,* 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683; *Craig,* 331 U.S. 367, 67 S.Ct. 1249, 91 L.Ed. 1546; *Pennekamp,* 328 U.S.

331, 66 S.Ct. 1029, 90 L.Ed. 1295; *Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941) (applying a "clear and present danger" standard and explaining that "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished")).

**F.**

[¶ 24.] First Amendment protections become meaningless if one can be punished for merely speaking on a pending case to a public that may contain future jurors. In this case, where the only communication charged as criminal was made in a public setting, it is vital to fix a precise standard for when the State may lawfully punish data dissemination about a pending trial. If an overbroad interpretation of a statute infringes on the right of free speech, it tends to discourage the exercise of that right. "Ambiguous meanings cause citizens to ' "steer far wider of the unlawful zone" ... than if the boundaries of the forbidden areas were clearly marked.' " *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494, n. 6, 102 S.Ct. 1186, 1191, n. 6, 71 L.Ed.2d 362, 369, n. 6, *reh. denied,* 456 U.S. 950, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982), (quoting *Baggett v. Bullitt,* 377 U.S. 360, 372, 84 S.Ct. 1316, 1323, 12 L.Ed.2d .377, 385 (1964)).

■ [¶ 25.] In First Amendment cases, appellate courts must "make an independent examination of the whole record" to ensure that "the judgment does not constitute a forbidden intrusion on the field of free expression." *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502, 515 (1984) (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 284–286, 84 S.Ct. 710, 729, 11 L.Ed.2d 686, 709 (1964)). It is incumbent on us, therefore, to give our jury tampering statute a narrowing construction sufficient to keep it from encroaching on First Amendment liberties. In *Florida Star,* the Supreme Court held

that when a newspaper publishes information lawfully obtained, a state may impose punishment, if at all, only when the statute is "narrowly tailored to a state interest of the highest order...." 491 U.S. at 541, 109 S.Ct. at 2613, 105 L.Ed.2d at 460.

[¶ 26.] South Dakota surely holds an interest of the "highest order" in maintaining the integrity and fairness of its judicial proceedings. Impartial jurors form the bedrock of our system. The purpose of SDCL 22–11–16 is to prohibit an attempt to improperly influence jurors. We cannot tolerate efforts to subvert the process by those who would inject into a trial illicit and extraneous material an impartial jury should not hear. "Legal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges*, 314 U.S. at 271, 62 S.Ct. at 197, 86 L.Ed. at 207. Those who illegally attempt to influence jurors may not immunize themselves by claiming a right to speak freely to anyone on any subject. But without a narrow standard with which to judge challenged speech, we neglect the hard·won freedoms alive in the First Amendment.

[¶ 27.] The standard applied to defendant's acts of distributing her posters was whether she attempted to "influence" a "person ... drawn as a juror...." *See* SDCL 22–11–16(2). Almost every public expression is an attempt to influence. How narrowly that influence was directed is the question. *Cf. Duke v. United States*, 90 F.2d 840, 841 (4th Cir.1937) (unsolicited letter delivered to grand jury). In the defendant's trial, the court's instructions drew no distinction between expression protected by the First Amendment and communication designed to influence a person drawn as a juror.[3] Jurors in the

defendant's trial could have logically deduced from the court's instructions: (1) the defendant by imparting information to the public attempted to "influence" the public; (2) among the public were prospective jurors; and, therefore, (3) the defendant attempted to "influence" prospective jurors. This deduction seems inescapable because the jury had no instruction distinguishing public expression from improper communication with jurors.

[¶ 28.] That a future juror might somehow hear or read of someone's public statement cannot feasibly constitute the precisely tailored restriction necessary to justify punishing speech otherwise protected by the First Amendment. If that conduct can be punished, then why not other types of public comment about a pending case? A letter to the editor, a newspaper op-ed piece, a television or radio commentary, a political speech, even an aside to one's neighbor, all may be latent criminal acts if prospective jurors might learn of them. If this is how the statute is meant to operate, then what a fearful instrument it is to repress criticism and stifle debate.

### G.

[¶ 29.] With its friction between competing constitutional values, this case presents difficulties not easily reconciled. As we trace through the many First Amendment decisions, we discern no single methodology designed to set precisely the boundaries between the right of free speech and the crime of illegally influencing a juror. Perhaps the least that can be said is that "[e]ach method of communicating ideas is a 'law unto itself' and that law must reflect the 'differing natures, values, abuses and dangers' of each method." *Metromedia*, 453 U.S. at 501, 101 S.Ct. at 2889, 69 L.Ed.2d at 811 (quoting *Kovacs v. Cooper*,

---

3. In the defendant's trial, Instruction # 15 set forth the elements of the offense:

The elements of the crime of attempting to influence a juror, each of which the state must prove beyond a reasonable doubt, are that at the time and place alleged:

· 1. The defendant attempted to influence a juror or a person summoned or drawn as

a juror in any cause or matter about to be brought before that person.

2. The defendant's attempt to influence was by a written or oral communication not given in the regular course of the proceedings upon trial of the cause.

336 U.S. 77, 97, 69 S.Ct. 448, 459, 93 L.Ed. 513, 528 (1949)). We find some guidance in those decisions that attempt to balance the competing values in our constitution: "Where First Amendment rights are asserted ... resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown." *Barenblatt v. United States*, 360 U.S. 109, 126, 79 S.Ct. 1081, 1093, 3 L.Ed.2d 1115, 1129 (1959). Although our criminal justice system retains the power to protect the integrity of its processes, in "borderline instances where it is difficult to say upon which side the alleged offense falls, ... the specific freedom of public comment should weigh heavily against a possible tendency to influence pending cases." *Pennekamp*, 328 U.S. 331, 347, 66 S.Ct. 1029, 1037, 90 L.Ed. 1295, 1303-04. When it is alleged that an attempt to influence jurors was made by addressing the public, the balance must be inclined in favor of free speech by narrowly construing our statute.

[¶ 30.] The defendant was convicted of Count 2 (SDCL 22–11–16(2)), attempting to influence a person drawn as a juror "[b]y means of any book, paper or instrument exhibited otherwise than in the regular course of proceedings upon the trial of the cause[.]" In essence, the statute prohibits an improper attempt to influence a prospective juror. To "attempt" to commit a crime one must have the specific intent to commit each of the acts constitut-

ing the offense. *See* SDCL 22–4–1; *State v. Lyerla*, 424 N.W.2d 908, 912 (S.D.1988) (*citing State v. Primeaux*, 328 N.W.2d 256 (S.D.1982); *State v. Poss*, 298 N.W.2d 80 (S.D.1980); *State v. Rash*, 294 N.W.2d 416 (S.D.1980); *State v. Martinez*, 88 S.D. 369, 220 N.W.2d 530 (1974); *State v. Judge*, 81 S.D. 128, 131 N.W.2d 573 (1964)).

 [¶ 31.] A reasonable interpretation of our statute confines its scope to conduct designed to influence specifically jurors and persons summoned or drawn as jurors. Consequently, the statute would not include situations where a person intends to inform the public or express a public opinion, regardless of whether jurors—drawn, summoned, or sworn—may be among the public. This is consistent with the reach of decisions around the country dealing with attempts to solicit or tamper with jurors and prospective jurors.[4] *See* cases collected at Wharton's Criminal Law § 566 (15th ed. 1996 and Supp. 1999). With these constraints on the scope of SDCL 22–11–16(2), the statute meets the constitutional requirements of notice and specificity without infringing on First Amendment rights. Thus, the question is, did the defendant knowingly target prospective jurors in particular, with the specific intent to influence their verdict? On retrial, consonant with this standard, the defendant will be given the benefit of a jury instruction distinguishing between the crime of attempting to influ-

4. In *Turney v. State*, 936 P.2d 533 (Alaska 1997), a case the dissent cites, the Alaska Supreme Court took an approach similar to ours by (1) construing its jury tampering statute to require a specific intent to influence a juror in his or her capacity as a juror in a particular case, and (2) requiring the prosecution to "prove that the defendant *knew* that he was communicating with a juror before he can be found guilty of jury tampering." *Id.* at 541 (emphasis in original) ("knowledge is an historic requirement of the offense") (*citing Pettibone v. United States*, 148 U.S. 197, 206, 13 S.Ct. 542, 546, 37 L.Ed. 419 (1893)). Unlike our case, there was no ambiguity in Turney's conduct, as he approached persons wearing "juror" badges inside and outside the

courthouse in an effort to have them adopt his jury nullification views to favor his friend on trial. Like us, the Turney Court was careful in its reading of Alaska's jury tampering statute to distinguish "between speech directed at the jurors who will decide a particular case and speech aimed at the general public." *Id.* at 542, 13 S.Ct. 542. *See also United States v. Smith*, 555 F.2d 249, 250–51 (9th Cir.1977) (reversing tax protestor's conviction for criminal contempt for loudly remarking in presence of juror in the trial of another tax protestor, "I hope this jury doesn't go along with those communistic tax laws," because he spoke merely with willful and wanton disregard of whether jurors might hear him, not knowingly and willfully).

ence a juror and the right to free expression.[5]

[¶ 32.] Affirmed.

[¶ 33.] AMUNDSON, Justice, concurs.

[¶ 34.] MILLER, Chief Justice, concurs specially.

[¶ 35.] SABERS and GILBERTSON, Justices, dissent.

MILLER, Chief Justice (concurring specially)

[¶ 36.] While I do not condone the defendant's actions in this case, it is important to remember that the issue here is not whether she committed the crime with which she was charged. The issue is whether the trial court erred in granting a new trial because it failed to give an instruction on the First Amendment. Clearly, the defendant would have been Constitutionally permitted to broadcast her message standing on a soap box in the town square or even via a television or radio spot. How can she be denied the right to have a jury be aware of her First Amendment protections?

SABERS, Justice (dissenting).

[¶ 37.] I disagree with the majority opinion's conclusion that the trial court or this court should write a correct First Amendment jury instruction for Debra.

[¶ 38.] I agree that the real question here is whether the defendant placed her posters in Martin, South Dakota to "target prospective jurors particularly, with the specific intent to influence their verdict." Because that is the real question, the First Amendment is not an issue.

[¶ 39.] Debra was charged with the crime of attempting to influence jurors under SDCL 22–11–16, which provides:

Any person who attempts to influence a juror, or any person summoned or drawn as a juror, or chosen an arbitrator or appointed a referee, in respect to his verdict or decision in any cause or matter pending, or about to be brought before him:

(1) By means of any communication, oral or written, had with him, except in the regular course of proceedings upon the trial of the cause;

(2) By means of any book, paper or instrument exhibited otherwise than in the regular course of proceedings upon the trial of the cause; or

(3) By publishing any statement, argument or observation relating to the cause;

is guilty of a Class 6 felony.

[¶ 40.] Essential to imposing criminal penalties under SDCL 22–11–16 is a finding that Debra had the criminal intent to influence potential jurors. The statute only prohibits speech and conduct that is intended to influence a juror, *including* "any person summoned or drawn as a juror,*" in his or her capacity as a juror in a particular case. The conduct here, the deliberate and calculated displaying of posters in a small town where her son's trial was to commence and where the jury was to be selected from, is within the core of the conduct prohibited by SDCL 22–11–16. Whether the content of the posters was admissible or inadmissible is of little relevance because the statute prohibits the *intent* of using *any* information in an effort to influence jurors. This content-neutral statute is narrowly tailored to prevent criminal behavior and is unrelated to the suppression of free expression. It is also irrelevant that "Debra did not personally solicit any juror whose name had been drawn." Again, it is the intent and the acting on that intent that is evaluated; that is, whether Debra had the criminal

---

5. In keeping with our limited role as a reviewing court, we do not examine the sufficiency of the evidence in this case, as the defendant has not brought the matter to our attention by notice of review or otherwise.

intent to influence jurors when she distributed her posters.[6]

[¶ 41.] The majority opinion concludes, in section C, that "the State imposes a prohibition on [an] individual that it is unprepared to impose on the press." I disagree. Debra's question, "if the paper can write that stuff, why can't I[?]," can be answered as simply as it is asked: there is simply no evidence that the newspaper reporters or publishers possessed "the requisite intent to influence jurors' actions as jurors in particular cases." *Turney v. State*, 936 P.2d 533, 544 (Alaska 1997). *See also Rapp v. Disciplinary Bd.*, 916 F.Supp. 1525, 1535 (D.Haw.1996) (stating that the "petitioners' asserted reasons for the interviews, 'while not without first amendment significance, [were] not "paramount" like the public's right to receive information necessary for informed self-government.' "). Furthermore, newspaper editorials criticizing judicial proceedings are protected by the First Amendment. *See Pennekamp v. State of Florida*, 328 U.S. 331, 346–50, 66 S.Ct. 1029, 1037–39, 90 L.Ed. 1295 (1946); *Bridges v. State of California*, 314 U.S. 252, 268–78, 62 S.Ct. 190, 196–201, 86 L.Ed. 192 (1941). In fact, the United States Supreme Court held that such commentary is punishable only if the risk of an unfair administration of justice is " 'extremely serious and the degree of imminence [is] extremely high.' " *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 845, 98 S.Ct. 1535, 1544, 56 L.Ed.2d 1, 14 (1978) (quoting *Bridges*, 314 U.S. at 263, 62 S.Ct. at 194).

[¶ 42.] Clearly, communications directed to jurors differ from communications directed to the general public.[7] Here, we are not determining First Amendment rights of the media. Instead, we are determining whether Debra was entitled to jury instructions on the First Amendment. She was not so entitled because "[t]he [F]irst [A]mendment does not provide a defense to a criminal charge simply because the actor uses words to carry out h[er] illegal purpose." *United States v. Barnett*, 667 F.2d 835, 842 (9th Cir.1982). Therefore, Debra's comparison of her conduct to a newspaper's ability to publish information for the general public is essentially a comparison of broccoli, not apples, to oranges.

[¶ 43.] Debra chose to distribute her posters in the town of Martin, population 1,151, which is located within the county of Bennett, population 3,206. South Dakota Legislative Manual 1999–2000 613, 626. She did not choose to distribute her posters in Stanley County, where the murder occurred. Nor did she choose to distribute them in Marshall, Minnesota, where she resided. It was no accident that Martin was the *only* town in which Debra distributed her posters. To the contrary, it was a strategic, deliberate and calculated decision made for the obvious criminal intent to influence any of the 150 potential jurors who were summoned to appear for jury duty two weeks prior to the scheduled date for her son's trial. The jury found, beyond a reasonable doubt, that the State proved the elements of the crime and that Debra was guilty of attempting to influence jurors.

[¶ 44.] The majority opinion meticulously attempts to establish that the First Amendment applies in this case. However, freedom of speech is not an absolute right. *See* Justice Konenkamp's writing for a unanimous court in *State v. Hauge*,

---

6. The majority opinion states "[h]ere, the only act the State seeks to punish is the act of communication." This statement is dead wrong as the statute clearly prohibits the *intent* of using any information to attempt to influence jurors.

7. The majority opinions cites to *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) as support. However, the facts in *Gentile* are substantially different. In *Gentile*, the Court was dealing with an attorney who made statements to the media about a pending trial. Here, we are dealing with communications made by a defendant's mother with intent to influence prospective jurors in the town where her son's trial was to commence.

1996 SD 48, ¶ 10, 547 N.W.2d 173, 176 (stating that defendant's conduct of violating a protection order by sending a letter does not fall within the "ambit of the rights of free speech protected by the First Amendment"). *See also People v. Borrelli,* 77 Cal.App.4th 703, 91 Cal. Rptr.2d 851, 860 (2000) (holding that a stalking statute does not infringe on free speech rights because it "does not regulate the *content* of speech [as much] as *the manner* in which the communication is made." (emphasis in original)).

[¶ 45.] The United States Supreme Court has stated: "[a] State may adopt safeguards necessary and appropriate to assure that the administration of justice at all stages is free from outside control and influence." *Cox v. Louisiana,* 379 U.S. 559, 562, 85 S.Ct. 476, 480, 13 L.Ed.2d 487, 491 (1965). In *Cox,* the Court examined a statute which prohibited picketing near a courthouse. *Id.* at 560, 85 S.Ct. at 478–79, 13 L.Ed.2d at 489–90. The Court held that the statute was constitutional. *Id.* at 564, 85 S.Ct. at 481, 13 L.Ed.2d at 492. In so finding, the Court stated:

> A narrowly drawn statute such as the one under review is obviously a safeguard both necessary and appropriate to vindicate the State's interest in assuring justice under law.
>
> *Nor does such a statute infringe upon the constitutionally protected rights of free speech and free assembly. The conduct which is the subject of this statute – picketing and parading – is sub-* ject *to regulation even though intertwined with expression and association. Id.* at 562–63, 85 S.Ct. at 480, 13 L.Ed.2d at 491 (emphasis added). The Court further stated: "[i]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." *Id.* at 563, 85 S.Ct. at 480, 13 L.Ed.2d at 491–92 (quoting *Giboney v. Empire Storage & Ice Co.,* 336 U.S. 490, 502, 69 S.Ct. 684, 691, 93 L.Ed. 834, 843–44 (1949)).

[¶ 46.] The purpose of SDCL 22–11–16 is to ensure the administration of justice by prohibiting the intent to improperly influence potential jurors. It prohibits conduct that attempts to influence jurors. The statute is narrowly tailored. Only communications intended to affect the manner that the jury decides a specific case are prohibited. Certainly, the State has a legitimate interest in protecting and ensuring the execution of a fair and impartial judicial system. With the passage of SDCL 22–11–16, our legislature intended to prohibit any unreasonable conduct which, by its very nature, erodes the impartiality of jurors.[8] Undoubtedly, it is the type of regulation envisioned by the Court in *Cox* as constitutional.

[¶ 47.] In *Turney v. State,* 936 P.2d 533, 541 (Alaska 1997), Frank Turney, a leafleter for the Fully Informed Jury Association, was charged with jury tampering under AS 11.56.590.[9] He challenged the

---

8. In evaluating legislative intent, the United States Supreme Court has stated:

 It is our settled policy to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.

 *Gomez v. United States,* 490 U.S. 858, 864, 109 S.Ct. 2237, 2241, 104 L.Ed.2d 923 (1989) (citations omitted). If a "reasonable alternative interpretation" exists which "poses no constitutional question," that interpretation should be used.

 In weighing this statute against the First Amendment, a "reasonable alternative inter-

pretation" is that this statute prohibits the *intent* to influence potential jurors and not the mere expression of opinion.

9. This statute provides:

 (a) A person commits the crime of jury tampering if the person directly or indirectly communicates with a juror other than as permitted by the rules governing the official proceeding with intent to
 (1) influence the juror's vote, opinion, decision, or other action as a juror; or
 (2) otherwise affect the outcome of the official proceeding.
 (b) Jury tampering is a class C felony.

constitutionality of the statute as a violation of his First Amendment rights. In its analysis, the Alaska Supreme Court stated:

> Speech aimed at influencing the juror's conduct as a juror, i.e, the juror's execution of the responsibilities imposed by the trial court in a particular case, *is not constitutionally protected.* Justice Frankfurter noted that
>
>> In securing freedom of speech, the Constitution is hardly meant to create the right to influence judges or juries. That is no more freedom of speech than stuffing a ballot box is an exercise of the right to vote.

*Id.* (quoting *Pennekamp v. Florida,* 328 U.S. 331, 366, 66 S.Ct. 1029, 1047, 90 L.Ed. 1295 (1946) (Frankfurter, J., concurring) (emphasis added)). The court went on to conclude that the statute was indeed constitutional and determined:

> In our view, the statute is not so imprecise that persons wishing to engage in constitutionally protected speech would be discouraged from doing so. *The statute describes the prohibited conduct and required intent.* It distinguishes between speech directed at the jurors who will decide a particular case and speech aimed at the general public.... Because *the conduct must be accompanied by the intent specified by the statute,* there is a correlation between the words of the statute and the constitutionally unprotected conduct.

*Id.* at 542–43 (emphasis added). *See also* United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (involving an unsuccessful First Amendment challenge by defendant convicted of burning his selective service registration certificate publicly to influence others to adopt his anti-war beliefs).

[¶ 48.] In aligning with the *Turney* court's rationale, I conclude that the First Amendment does not grant immunity to Debra. To the contrary, "[c]onduct of this nature is obviously not protected by the guarantees of free speech provided for in the First Amendment." *State v. Crelly,* 313 N.W.2d 455, 457 (S.D.1981) (holding that an unlawful obscene telephone call statute was constitutional); *see also Hauge,* 1996 SD 48, ¶ 10, 547 N.W.2d at 176 (stating that defendant's conduct of violating a protection order by sending a letter does not fall within the "ambit of the rights of free speech protected by the First Amendment"). Debra went beyond her right of freedom of expression in a public forum and intruded upon the impartiality guaranteed within the justice system. She can not now assert that the First Amendment shields her from responsibility.[10]

[¶ 49.] The majority opinion recognizes that Debra's proposed instruction is "obviously inadequate," but excuses the "inadequacy" by stating "we have never before construed our jury tampering statute, much less given it a narrowing interpretation...." Such an excuse is nonsense. The First Amendment is not a new concept and Debra certainly could have proposed an instruction that adequately reflected the law. Instead, she proposed:

> Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

---

10. The majority opinion states that Debra had a First Amendment right to display her posters in the stores in Martin: "Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum." (quoting *Schenck,* 519 U.S. at 358, 117 S.Ct. at 867, 137 L.Ed.2d at 21) (citations omitted).

Leafletting is admittedly considered to be speech, but the application to Debra's case is erroneous because she *intended* to use her posters as a mechanism to influence potential jurors, much like Turney did in *Turney v. State, supra.* The First Amendment is not a defense available to Debra under these circumstances.

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble and to petition the government for a redress of grievances. This instruction is somewhat irrelevant to Debra's case, confusing to the jury, improper, self-serving and does not adequately reflect the law concerning the First Amendment. Clearly, it was not an abuse of discretion for the trial court to refuse it, even if she later changed her mind; thus, no error occurred at trial to justify the granting of the motion for a new trial.

[¶ 50.] I vote to reverse and remand to the trial court with directions to reinstate the jury's verdict, enter a judgment of conviction and proceed to sentencing. Anything more favorable to Debra is judicial legislation at it's worst.[11]

[¶ 51.] GILBERTSON, Justice, joins this dissent.

---

11. I respectfully submit that the majority opinion, although intellectually elegant in appearance and beautifully written, shies away from a holding of unconstitutionality. I say the statute is constitutional and we should not impose an obligation on trial courts or ourselves under the pretense that the statute is unconstitutional. If the majority opinion can establish unconstitutionality, and it can not, let it do so expressly.