#25008-rev in pt & rem-JKM

**2009 SD 81**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

ROSEMARY ARMSTRONG and
ALPHIE PETERSEN,                                  Plaintiffs and Appellants,

v.

TURNER COUNTY BOARD OF
ADJUSTMENT,                                        Defendant and Appellee,

VIBORG COOPERATIVE ELEVATOR
ASSOCIATION,                                       Intervenor.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE FIRST JUDICIAL CIRCUIT
TURNER COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE TIMOTHY W. BJORKMAN
Judge

\* \* \* \*

PAUL H. LINDE of
Schaffer Law Office, Prof. LLC              Attorneys for plaintiffs
Sioux Falls, South Dakota                   and appellants.

MICHAEL A. HENDERSON of
Cadwell, Sanford, Deibert & Garry, LLP      Attorneys for defendant
Sioux Falls, South Dakota                   and appellee.

\* \* \* \*

ARGUED ON MAY 27, 2009

OPINION FILED **08/26/09**

#25008

MEIERHENRY, Justice

[¶1.] Rosemary Armstrong and Alphie Petersen (Homeowners) appeal the circuit court's denial of a writ of certiorari challenging the Turner County Board of Adjustment (Board)'s approval of a conditional use permit issued to the Viborg Cooperative Elevator Association (Elevator). We reverse on the grounds that Homeowners did not receive due process because one of the Board members had a disqualifying interest and should not have participated as a decision maker.

## FACTS AND PROCEDURAL BACKGROUND

[¶2.] In 2006, the Elevator sought to construct a commercial grain storage facility on property it owned located adjacent to the Viborg city limits in Turner County. The proposed facility consisted of two bunkers. Each bunker measured 100 x 250 feet and would hold approximately 250,000 bushels of corn. While the Elevator's property was zoned agricultural, the property abutted an area zoned residential. Homeowners owned single-family residences on this abutting property within the city limits of Viborg. The Elevator's proposed commercial grain storage facility was not a permitted use under Turner County zoning ordinances. The zoning ordinances, however, identified a grain storage facility as a conditional use eligible for a conditional use permit. To acquire a conditional use permit, the Elevator had to submit an application to the Turner County Board of Adjustment.

[¶3.] Instead of applying for a conditional use permit, the Elevator applied for a building permit with the Turner County zoning administrator. By mistake, the administrator issued the Elevator a building permit on October 6, 2006. The administrator realized her mistake on or about October 18, 2006, and informed the

-1-

Elevator that the building permit was invalid and that the Elevator needed a conditional use permit. During the interim, the Elevator claimed it had spent around $44,000 on the facility. The Elevator subsequently applied to the Board for a conditional use permit.

[¶4.]    The Board scheduled a public hearing on the application for November 14, 2006. Homeowners attended the hearing to object. Homeowners claimed that placement of the facility was incompatible and would disturb the residential atmosphere of the area and diminish the value of their homes. The Homeowners' concerns about the permit included the distance of the facility to their homes, the continuous noise from the facility's large aeration fans and the increased traffic on the access road between the homes and the storage facility. The Elevator acknowledged that approximately one thousand trucks would use the access road during the harvest season. The Homeowners also complained of seeing an increase in rodents, dust, and drainage problems attributable to the placement of the grain storage facility. The Board had several concerns with the application. One of the concerns was the proposed facility's close proximity to the city's residential area. The Board ultimately denied the permit because of the Elevator's application was inadequate.

[¶5.]    In December of 2006, the Elevator filed a revised application, and another hearing was set for January 9, 2007. Between the Board's hearing on the original application and the hearing on the revised application, one of the Board members was replaced. The outgoing county commissioner was replaced [on the Board] by County Commissioner Lyle Van Hove.

[¶6.] Before going on the board of adjustment, Van Hove had been involved in the dispute between the Homeowners and the Elevator in his role as county commissioner. Van Hove knew that the county's employee, the county zoning administrator, had erroneously issued a building permit. Van Hove was worried about the county's possible liability to the Elevator for the mistake. Consequently, Van Hove in his capacity as a county commissioner made contact with the attorney for the Elevator and also with the attorney of the Homeowners in an attempt to negotiate conditions that would satisfy the Homeowners. The attorney for the Homeowners testified that his conversation with Van Hove included the topic of the County's liability for the Elevator's expenditures on the facility between the time of issuing the invalid building permit and the time the Elevator was notified of its invalidity. The Elevator claimed it spent $44,000 during that time.

[¶7.] On January 9, 2007, the Board held a hearing on the Elevator's revised application. In this hearing, Van Hove participated as a member of the Board. At the close of the hearing, Van Hove moved to approve the conditional use permit. All of the members of the board approved the conditional use permit for two grain storage bunkers. The Board adopted the written findings of the zoning administrator in accord with the county ordinances. The findings certified that the proposed facility complied with the conditional use zoning ordinance requirements. One of the requirements was for the facility to be generally compatible with surrounding property. In addressing compatibility, the Board cited compatibility with property on three sides of the facility–a lagoon to the north, the industrial park to the east, and the Viborg elevator three blocks to the south. The findings did not

include any specific reference to compatibility with the residential property to the west of the proposed grain facility. Nevertheless, the Board approved the permit.

[¶8.] Homeowners filed a petition for writ of certiorari with the circuit court on February 9, 2007. The Board subsequently scheduled a rehearing. The Board's notice for rehearing cited the reason for rehearing was because "[t]he Board [had] received criticism of an alleged deficiency in the Findings reached." On October 9, 2007, the Board conducted the rehearing and added seven conditions to the permit. This time, the Board acknowledged the residential housing to the west side of the storage facility and entered a finding as to general compatibility as follows: "property is adjoining to landfill to lagoon areas to the north, industrial to the east, as to the west, residential to the west, meets set backs, like properties on 3 sides." Under additional findings the Board wrote, "Brian Schmidt—Expert Witness – testified loss of value to adjoining residential property."

[¶9.] Homeowner's writ of certiorari proceeded to a hearing before the circuit court on July 10, 2008. The circuit court denied the writ of certiorari. The Homeowners appeal the court's decision raising two issues: (1) whether Homeowners were denied due process because Van Hove should have been disqualified as a decision maker because of his interest in the outcome, and (2) whether the Board exceeded its authority when the Board did not follow the county's ordinance as to compatibility with adjoining property.

## STANDARD OF REVIEW

[¶10.] The standard of review in many of the recent appeals from a county's decision on a conditional use permit has been limited in scope because the appeals

reached the Court through a writ of certiorari. However, a recent case, *Goos RV Center v. Minnehaha County Comm'n*, approved of a de novo review pursuant to SDCL 7-8-27. 2009 SD 24, ¶8, 764 NW2d 704, 707. Although *Goos RV Center* appears on the surface to contradict some of our prior decisions on proper appellate procedure and standard of review, the source of the different procedures derives from the legislature. Prior to 2004, the law provided that a county board of adjustment had the authority to approve conditional use permits and variances. The law also specified that appeals from a board of adjustment went directly to circuit court by way of a writ of certiorari. *See id.* ¶20, 764 NW2d at 711 (citing Jensen v. Turner Cty. Bd. of Adjustment, 2007 SD 28, ¶4, 730 NW2d 411, 412-13); *see also* Elliott v. Board of County Comm'rs of Lake County, 2005 SD 92, ¶14, 703 NW2d 361, 367. In 2004, the legislature removed the provision in the law that gave a county board of adjustment the authority to approve conditional use permits. In its place, the legislature passed a new law giving the power to the county to designate the entity responsible for approving conditional use permits. SDCL 11-2-17.3. Although the legislature left intact the appeal procedure from a board of adjustment, the legislature omitted any reference to an appeal procedure if the county-designated entity was not a board of adjustment.

[¶11.] The effect of the omission has created inconsistencies in the appeal process depending on which entity a county designates as the approving authority. Thus, the same action of approving or denying a conditional use permit may have a different appeal procedure depending on which entity approves the permit. In this case, the county board of adjustment approved the permit, and the statute requires

that an appeal from a decision of a county board of adjustment proceed directly into

circuit court in the form of a writ of certiorari. SDCL 11-2-62. In *Goos RV Center*,

the Minnehaha County ordinances designated the planning and zoning board as the

approving authority and apparently allowed an appeal to the county commission

before proceeding to circuit court. 2009 SD 24, ¶21, 764 NW2d at 711. Generally,

an appeal into circuit court from a county commission decision is a de novo review

under SDCL 7-8-27. Whether intentional or inadvertent, the current law allows for

inconsistent procedures among counties and a confusing system of approving and

appealing conditional use permits.

[¶12.]        Since the appeal in this case is from a county board of adjustment, it

comes to the Court through a writ of certiorari. SDCL 11-2-61; SDCL 11-2-62;

SDCL 21-31-8. *See Jensen*, 2007 SD 28, ¶4, 730 NW2d at 412-13 (citing Elliott,

2005 SD 92, ¶¶13-14, 703 NW2d at 367). The Court's scope of review on a writ of

certiorari "cannot be extended further than to determine whether the . . . board . . .

has regularly pursued [its] authority. . . ." SDCL 21-31-8. We have explained the

limited scope of review as follows:

> Our consideration of a matter presented on certiorari is limited
> to whether the board of adjustment had jurisdiction over the
> matter and whether it pursued in a regular manner the
> authority conferred upon it. A board's actions will be sustained
> unless it did some act forbidden by law or neglected to do some
> act required by law.

*Jensen*, 2007 SD 28, ¶4, 730 NW2d at 413 (quoting *Elliott,* 2005 SD 92, ¶14, 703

NW2d at 367). Additionally, we have said, "[w]ith a writ of certiorari, we do not

review whether the [board's][ ] decision is right or wrong. We are limited to

determining whether the [board][ ] regularly pursued its authority." Duffy v. Circuit Court, Seventh Judicial Circuit, 2004 SD 19, ¶33, 676 NW2d 126, 138.

## ANALYSIS

[¶13.]     The Homeowners first argue that they did not receive a fair and impartial due process hearing due to the presence of Van Hove on the Board. The Homeowners contend that Van Hove had a conflict of interest in the proceedings because of his involvement as a county commissioner in trying to resolve the dispute.

*Zoning Laws and Ordinances*

[¶14.]     The legal framework for a county's zoning authority stems from the South Dakota legislature. The legislature authorizes a county to establish and administer zoning ordinances. SDCL ch 11-2. The board of county commissioners has the authority to adopt by ordinance a comprehensive zoning plan that regulates land use in the county. SDCL 11-2-13. The responsibility to develop and present the county zoning plan or any subsequent changes rests with a county planning and zoning commission. SDCL 11-2-2; SDCL 11-2-11. The planning and zoning commission is comprised of "five or more members" appointed by the county commission and "at least one member shall be a member of the board of county commissioners." SDCL 11-2-2. Once approved, the zoning ordinances are administered by a county administrative official. SDCL 11-2-25. Appeals from an administrator's decisions are heard by the board of adjustment. SDCL 11-2-53. In addition to hearing and deciding appeals, the board of adjustment has the power to authorize variances. *Id.* The board of county commissioners can appoint a separate

board of adjustment or may appoint "the planning and zoning commission to act as a board of adjustment," or the board of county commissioners "may act as and perform all the duties and exercise the powers of the board of adjustment." SDCL 11-2-49; SDCL 11-2-60.

[¶15.] The legislature set forth the specifics required in a county zoning ordinance "that authorizes a conditional use of real property." SDCL 11-2-17.3. The statute provides:

> A county zoning ordinance adopted pursuant to this chapter that authorizes a conditional use of real property shall specify the approving authority, each category of conditional use requiring such approval, the zoning districts in which a conditional use is available, and the criteria for evaluating each conditional use. The approving authority shall consider the stated criteria, the objectives of the comprehensive plan, and the purpose of the zoning ordinance and its relevant zoning districts when making a decision to approve or disapprove a conditional use request.

SDCL 11-2-17.3.

[¶16.] A conditional use is defined by the South Dakota Legislature as follows:

> [A]ny use that, owing to certain special characteristics attendant to its operation, may be permitted in a zoning district subject to the evaluation and approval by the approving authority specified in § 11-2-17.3. A conditional use is subject to requirements that are different from the requirements imposed for any use permitted by right in the zoning district.

SDCL 11-2-17.4. The Turner County zoning ordinances further define conditional use as:

> A use that would not be appropriate generally or without restriction throughout the zoning district but which, if controlled as to number, area, location, or relation to the neighborhood, would promote the public health, safety, or general welfare. . . .

Turner County, SD, Zoning Regulation 2.02 (June 1998). The Turner County

zoning ordinances allow for conditional use of property and designate the county

board of adjustment as the approving authority for conditional use permits. Under

the zoning ordinances, the Turner County Board of Adjustment is the same as the

county board of planning and zoning and consists of "five members, one of whom

must be a member of the Turner County Commission." Turner County, SD, Zoning

Regulation 4.03.01 (June 1998).

[¶17.] Technically, under the law, each entity - the board of county

commissioners, the planning and zoning commission, and the board of adjustment -

has a different statutory function with different statutory responsibilities and

powers in regard to land use and regulation. Keeping the legal duties of each entity

separate becomes problematic when their functions and members are intermingled.

Nevertheless, the necessity of keeping the entities separate is of utmost importance.

In *Bechen v. Moody County Bd. Of Comm'rs*, overruling a prior case, we noted:

> [T]hat when a county commission decides not to appoint a
> separate board of adjustment, but elects to sit as the board of
> adjustment, this does not mean that the county commission and
> the board of adjustment become a single entity. While the
> members of each board may be identical, each board remains a
> separate legal entity with its own distinct powers and
> responsibilities under state law.

2005 SD 93, ¶11, 703 NW2d 662, 665.

[¶18.] The Turner County zoning ordinances set forth the procedure for the

board of adjustment when considering a conditional use application. The ordinance,

in part, provides as follows:

> Before any Conditional Use Permit shall be granted, the
> Board of Adjustment shall make written findings certifying

> compliance with the specific rules governing individual
> Conditional Use Permits and that satisfactory provision and
> arrangement has been made concerning the following, where
> applicable:
>> (a) Ingress and egress to property and proposed structures
>> thereon, with particular reference to automotive and
>> pedestrian safety and convenience, traffic flow and
>> control, and access in case of fire or catastrophe;
>> (b) Off-street parking and loading areas where required;
>> (c) Refuse and service areas, with particular reference to
>> (a) and (b) above;
>> (d) Utilities, with reference to location, availability, and
>> compatibility;
>> (e) Screening and buffering with reference to type,
>> dimensions and character;
>> (f) Signs, if any, and proposed exterior lighting with
>> reference to glare, traffic safety, economic effect, and
>> compatibility and harmony with other properties in
>> the district;
>> (g) Required yards and other open space; and
>> (h) General compatibility with adjoining properties and
>> other property in the zoning district in which such use
>> is to be located.

Turner County, SD, Zoning Regulation 4.04.02 (D) (June 1998).

*Due Process Right to a Fair and Impartial Decisionmaker*

[¶19.]        The Fifth Amendment to the United States Constitution provides that

"[n]o person shall . . . be deprived of life, liberty, or property, without due process of

law[.]" US Const amend V. The United States Supreme Court has long held that

invasion of private property by the government is not unlimited. Nectow v. City of

Cambridge, 277 US 183, 188 (1928) (citing Euclid v. Ambler Co., 272 US 365, 395

(1926)). Zoning restrictions are allowed "for the purpose of promoting health,

safety, or the general welfare of the county." SDCL 11-2-13. Zoning ordinances

serve to limit the use of private property. "Although it is axiomatic that private

property cannot be taken without due process of law, this limitation does not shield

private property from regulations, such as zoning, which are implemented under the police power." Schafer v. Deuel County Bd. of Comm'rs, 2006 SD 106, ¶11, 725 NW2d 241, 245 (citations omitted). Conditional uses within a zoning district are authorized by ordinance and "owing to certain special characteristics attendant to its operation," must be evaluated and approved separately. SDCL 11-2-17.4. The nature of the evaluation and approval as it applies to specific individuals or situations is quasi-judicial. *See Schafer*, 2006 SD 106, ¶16, 725 NW2d at 249. Thus, a local zoning board's decision to grant or deny a conditional use permit is quasi-judicial and subject to due process constraints. As such, the "'constitutional right to due process includes fair and impartial consideration' by a local governing board." Hanig v. City of Winner, 2005 SD 10, ¶10, 692 NW2d 202, 205 (quoting Riter v. Woonsocket Sch. Dist., 504 NW2d 572, 574 (SD 1993)).

[¶20.]     The due process requirement is particularly important when individual property rights are affected. For the property owner seeking the conditional use permit and for other affected property owners, due process requires fair and impartial consideration by the Turner County Board of Adjustment. We have said:

> A fair trial in a fair tribunal is a basic requirement of due process. This applies to administrative agencies which adjudicate as well [as] to courts. Not only is a biased decision maker constitutionally unacceptable, but our system of law has always endeavored to prevent even the probability of unfairness.

*Id.* ¶10, 692 NW2d 205-06 (quoting Strain v. Rapid City Sch. Bd., 447 NW2d 332, 336 (SD 1989)).

[¶21.]     Because a county board of adjustment functions as an adjudicatory body when it hears requests for conditional use permits, members of the board must

be free from bias or predisposition of the outcome and must consider the matter with the appearance of complete fairness. A fair and impartial hearing depends on "whether there was actual bias or an unacceptable risk of actual bias." *Id.* ¶11, 692 NW2d at 206 (citing Voeltz v. John Morrell & Co., 1997 SD 69, ¶12, 564 NW2d 315, 317). A reviewing court must consider "'whether the record establishes either actual bias on the part of the tribunal or the existence of circumstances that lead to the conclusion that an unacceptable risk of actual bias or prejudgment inhered in the tribunal's procedure.'" *Id.* (quoting *Strain*, 447 NW2d at 336).

[¶22.]     It should be noted that the standard for disqualification in a quasi-judicial proceeding is stricter than in a regulatory or rule-making proceeding. Northwestern Bell Tel. Co., Inc. v. Stofferahn, 461 NW2d 129, 133 (SD 1990) (citing Application of Union Carbide Corp., 308 NW2d 753, 757 (SD 1981)). The standard for disqualification in a regulatory or rule-making proceeding "is that the official should be disqualified only when there has been a clear and convincing showing the official has an unalterably closed mind on matters critical to the disposition of the proceeding." *Id.* at 133-34 (citing Ass'n of Nat. Advertisers, Inc. v. F.T.C., 627 F2d 1151 (DCCir 1979)).

[¶23.]     The due process standard for disqualification in a quasi-judicial proceeding is that an official "must be disinterested and free from bias or predisposition of the outcome and the 'very appearance of complete fairness' must be present." *Id.* at 132-33 (quoting Mordhorst v. Egert, 88 SD 527, 223 NW2d 501, 505 (1974)). Decision makers "are presumed to be objective and capable of judging controversies fairly on the basis of their own circumstances." *Id.* at 133. However,

where actual bias or an unacceptable risk of actual bias or prejudgment exists, the decision maker must be disqualified from participating. *Id.*

[¶24.]    Determining disqualifying interest does not involve hyper-technical analysis. The interest must be "different from the interest of members of the general public." *Hanig*, 2005 SD 10, ¶20, 692 NW2d at 209. If the interest is different, then the question is whether a reasonably-minded citizen would conclude that the official's interest or relationship creates a potential to influence the official's impartiality. *See* Barrett v. Union Twp. Comm., 553 A2d 62, 67, 230 NJSuper195, 204-05 (1989). A disqualifying conflict of interest may exist even if the official has not acted upon it. *Id.* However, if "the circumstances [ ] could reasonably be interpreted as having the likely capacity to tempt," the official should be disqualified. *Voeltz*, 1997 SD 69, ¶13, 564 NW2d at 318. We have recognized that "personal or pecuniary interests" in the outcome of a proceeding have the potential to influence a decision maker's judgment. *Id.* Likewise, employment relationships or potential employment relationships with parties involved in the proceeding may cause a disqualifying conflict. *Id.*

[¶25.]    In *Hanig,* we found a disqualifying conflict of interest because of a councilwoman's employment and communication from her employer. 2005 SD 10, ¶20, 692 NW2d at 209. The councilwoman's employer opposed the liquor license renewal of a competing business and had written a letter to the councilwoman voicing his opposition. *Id.* Additionally, the councilwoman admitted her tips may be affected. *Id.* We found that her interest was "different from the interest of members of the general public," and "of sufficient magnitude . . . [to] disqualif[y] her

from participating in the decision." *Id.* We said: "Consequently, the circumstances and facts of each situation should control whether disqualification is required. If circumstances show a likely capacity to tempt the official to depart from his duty, then the risk of actual bias is unacceptable and the conflict of interest is sufficient to disqualify the official." *Id.* ¶15.

[¶26.]     In addition, courts have found bias or interest when a member of a zoning board communicated ex parte with parties involved in the matter before the board. In *Eacret v. Bonner County*, the Idaho Supreme Court held that a county commissioner's ex parte communication with a zoning variance applicant and viewing of the property in question resulted in a due process violation. 139 Idaho 780, 787, 86 P3d 494, 501 (2004). The Idaho Supreme Court noted that "[a] quasi-judicial officer must confine his or her decision to the record produced at the public hearing," and "[a]ny ex parte communication must be disclosed at the public hearing, including a 'general description of the communication.'" *Id.* at 786 (citations omitted). The Indiana Court of Appeals found bias when an interested party contacted a member of the zoning board on at least two occasions and discussed the importance of the member's opposition to the proposed zoning variance. City of Hobart Common Council v. Behavioral Inst. of Ind., LLC, 785 NE2d 238, 253-54 (IndApp 2003).

[¶27.]     Although local units of government are not subject to the South Dakota Administrative Procedure Act, SDCL 1-26-26 provides a generally accepted directive against ex parte communications and can provide guidance for quasi-judicial local entities. SDCL 1-26-26 prohibits officials who participate in

adjudicatory proceedings from having ex-parte communications. The law provides as follows:

> *Unless required for the disposition of ex parte matters authorized by law, members of the governing board or officers or employees of an agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case shall not communicate, directly or indirectly, in connection with any issue of fact, with any person or party, nor, in connection with any issue of law, with any party or his representative, except upon notice and opportunity for all parties to participate.* If one or more members of a board or commission or a member or employee of an agency, who is assigned to render a decision in a contested case, took part in an investigation upon which the contested case is based, he shall not participate in the conduct of the hearing nor take part in rendering the decision thereon, but he may appear as a witness and give advice as to procedure. If, because of such disqualification, there is no person assigned to conduct the hearing or render the decision, the agency shall appoint someone pursuant to § 1-26-18.1 to fulfill those duties. A person assigned to render a decision:
>
> (1) May communicate with other members of the agency; and
> (2) May have the aid and advice of one or more personal assistants.

SDCL 1-26-26 (emphasis added). The problem with ex-parte communications is that the opposing parties have no notice or opportunity to respond. We recently noted in the context of a judge's ex parte communication that communicating with one party without giving the opposing party notice and an opportunity to be heard would "not comport with basic understandings of due process." State v. Wilson, 2008 SD 13, ¶19, 745 NW2d 666, 672; *see* State v. Thorsby, 2008 SD 100, ¶13; 757 NW2d 300, 304 ("If an ex parte communication is invited or initiated by the judge, no prejudice needs to be shown.") (quoting O'Connor v. Leapley, 488 NW2d 421, 423 (SD 1992)).

*Board Member's Disqualifying Interest*

[¶28.] The question for this Court is whether the record establishes "actual bias or an unacceptable risk of actual bias." *Hanig*, 2005 SD 10, ¶11, 692 NW2d at 206. The Homeowner's attorney, Jeff Cole, testified regarding his contact with Van Hove and Van Hove's demeanor at the board of adjustment hearing. Cole had previously been the Turner County State's Attorney and had represented Turner County and attended many board of adjustment hearings. Van Hove had served a prior term on the board of adjustment while Cole served as State's Attorney. Cole testified that Van Hove had always been professional and asked questions and listened to both sides. Cole further testified that he noticed a change in Van Hove's demeanor at the January 9th hearing. Cole described Van Hove's demeanor as follows: "Well, I think from the beginning of that hearing it was clear to me that he was more of an advocate of a position than he was an impartial decisionmaker." The record shows a lively exchange at the beginning of the hearing between Van Hove and Cole about whether part of a plat was drawn to scale. They finally agreed to disagree.

[¶29.] Van Hove denied that he had an interest in the outcome and claimed he did not contact the parties' attorneys on the matter. Contrary to Van Hove's testimony, the circuit court specifically found that Van Hove had contacted the attorneys for both sides. The court found as follows:

> Turner County Commissioner Lyle Van Hove then contacted both Mr. Cole and Mr. McGill [the Elevator's attorney] to discuss this matter. This was in an effort on Van Hove's part to attempt to come to some resolution, given the error in issuing the building permit.

Van Hove admitted he was concerned about the county employee's mistake in issuing the building permit and was upset with the Elevator in the way it handled the building of the facility. However, he believed the Board made its decision based on the facts in front of it. Van Hove made the motion to approve the permit for the Elevator and added several conditions in an attempt to address the Homeowner's concerns.

[¶30.]     The question of an alleged bias or risk of bias centers on Van Hove's involvement as a county commissioner prior to sitting as a board of adjustment member. As a county commissioner, Van Hove's interest was "different from the interest of the members of the general public." *Hanig*, 2005 SD 10, ¶20, 692 NW2d at 209. Van Hove's concern was with the potential liability of the county because of its employee's mistake in issuing the building permit. He acted on that concern when he contacted the parties in the dispute to attempt to negotiate a settlement. In his role as a county commissioner, Van Hove's concerns about the potential liability to the county or even his attempts at negotiating with the parties to try to reach some agreement are not problematic. He was looking out for the county's interest. However, in his role as a member of the board of adjustment, his liability concerns and ex parte contacts are problematic because they had the potential to compromise his ability to be a fair and impartial adjudicator.

[¶31.]     Even though Van Hove claims he did not vote to grant the conditional use permit because of his concern for the county's potential liability, his interest can still serve to disqualify him as a quasi-judicial decision maker. A disqualifying interest depends on whether a reasonably-minded person would conclude that Van

Hove's interest in this matter had the potential to influence his impartiality. *See Barrett*, 553 A2d at 67, 230 NJ Super at 204-05. We conclude it does. A disqualifying interest depends on the facts of the case. Here, the disqualification is not simply because Van Hove simultaneously served as both a county commissioner and a board of adjustment member. Nor is he disqualified simply because he had knowledge of some of the facts prior to the quasi-judicial proceeding. He is disqualified because the facts showed that he was more deeply involved. He was concerned that the county may be liable for its employee's mistake and that he acted upon his concerns in an attempt to get the parties to negotiate a settlement. He became involved in the issue as a county commissioner prior to assuming the role of decision maker on the board of adjustment. Conceivably, his goal was to protect the county's interest by averting liability and negotiating a settlement. He communicated with both sides and did not inform the parties or the other board members of his ex parte communications or actions as a county commissioner. The attorneys testified that they were not aware of his ex parte communications with both sides until after the hearing.

[¶32.]       Due process requires fair and impartial consideration. The circumstances here created an unacceptable risk of impartiality. We hold that Van Hove should have been disqualified. Even though the vote was unanimous, we discern from the record that Van Hove actively participated in both the January 9, 2007, and October 9, 2007, hearings. Van Hove made the motion to grant the permit with conditions he proposed. His position as the only county commissioner on the board conceivably carried some weight with the other board members.

Because of the possible influence on the other board members' votes, the permit should be vacated and a new hearing conducted without Van Hove's participation. When a due process violation exists because of a board member's disqualifying interest, the remedy is to "place the complainant in the same position had the lack of due process not occurred." *Hanig*, 2005 SD 10, ¶22, 692 NW2d at 210 (citations omitted). Therefore, the Homeowners are entitled to a new hearing before a neutral Board. Turner County ordinances provide for alternates when a member is disqualified. South Dakota law does not require a county commission member serve on a board of adjustment.

*Conclusion*

[¶33.] Because of the violation of a due process right to a fair and impartial adjudication, we reverse and remand for a new hearing before the Board. We need not reach the other issue raised by the Homeowners.

[¶34.] KONENKAMP and SEVERSON, Justices, concur.

[¶35.] ZINTER, Justice, concurs specially.

[¶36.] GILBERTSON, Chief Justice, concurs in result.

ZINTER, Justice (concurring specially).

[¶37.] As this case points out, constituent communication creates legal problems when local governmental officials must serve in both legislative and quasi-judicial capacities. The Chief Justice's writing highlights the troubling paradox of needing to communicate with constituents in an official's legislative capacity, and a resulting disqualifying conflict or bias that may arise in the official's quasi-judicial capacity. We must be careful not to adopt jurisprudence categorically precluding

local officials, who have potential quasi-judicial responsibilities, from exercising their duties with their constituents. I write to point out that in my view, because of the conduct at issue, we have not drawn any such hard and fast rule in this case.

[¶38.] I agree with the Chief Justice that local government officials need not be disqualified simply because they wear two hats or even if they participate in fact-finding before the quasi-judicial proceeding arises. We rejected that notion in an analogous case involving a school board. *See* Strain v. Rapid City School Bd. for Rapid City Area School Dist., 447 NW2d 332, 336-37 (SD 1989) (holding that although the Rapid City School Board had received direct *ex parte* information in the course of exercising its representative responsibility as an elected board, it was permitted to preside over a subsequent quasi-judicial action to terminate the teacher who was the subject of the ex parte information).

[¶39.] The facts of that case reflect that, in their capacity as elected officials of the Rapid City School District, the school board members received and considered a law enforcement investigative report regarding a teacher who was accused of improper sexual conduct with a student. In rejecting the teacher's claim that the school board's consideration of that *ex parte* information violated the teacher's right to due process in a subsequent quasi-judicial dismissal hearing, we stated:

> "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 US 133, 136, 75 SCt 623, 625, 99 LEd 942, 946 (1955). . . . Not only is a biased decision maker constitutionally unacceptable, but "our system of law has always endeavored to prevent even the probability of unfairness." [*Id.*] The standard to be applied is whether the record establishes either actual bias on the part of the Board or the existence of circumstances that lead to the conclusion that an unacceptable risk of actual bias or prejudgment inhered in the Board's procedure. *Withrow v. Larkin,* 421 US 35, 95 SCt 1456, 43

> LEd2d 712 (1975); *Schneider v. McLaughlin Independent Sch. Dist.,* 90 SD 356, 241 NW2d 574 (1976). The United States Supreme Court has observed, however, that a school board is not disqualified as the decision maker solely because of prior involvement in a dismissal case. *Hortonville Dist. v. Hortonville Ed. Asso.,* 426 US 482, 96 SCt 2308, 49 LEd2d 1 (1976). Pre-decision involvement "is not enough to overcome the presumption of honesty and integrity in policy makers with decisionmaking power." *Hortonville, supra,* 426 US at 497, 96 SCt at 2316, 49 LEd2d at 11-12.

*Strain,* 447 NW2d at 336-37. We specifically acknowledged that those locally elected officials were required to look into such allegations before a quasi-judicial proceeding arose. We noted that "[s]uch an important decision could not be made in a vacuum of knowledge. The Board properly reviewed available information." *Id*. Moreover, we found no due process violation on that record, concluding [n]othing in the record in this case indicates that any of the members of the Board were in any way prejudiced or biased against Strain or prejudged the case." *Id*.

[¶40.] Thus, while I agree with the Chief Justice that we should not fashion rules categorically precluding elected officials from performing any of their official duties, this is not a case in which we have fashioned such black letter rules. This is not an area of the law that permits black letter rules. Although local officials may prefer black letter rules to provide guidance in future cases, *Strain* and similar cases confirm that local officials must necessarily work within a more flexible but less certain framework.

GILBERTSON, Chief Justice (concurring in result).

[¶41.] In this case Commissioner Van Hove did much more than receive input from the citizens of Turner County. Basically, as a commissioner he attempted to

orchestrate a plan whereby Turner County would avoid a lawsuit, which would subject it to potentially substantial detrimental financial consequences due to the erroneous issuance of a conditional use permit by a county official, and then voted as a member of the Board of Adjustment to put this plan into action. Such action on his part is incompatible with his duties as an impartial member of the Turner County Board of Adjustment.

[¶42.] However, the Court does not stop there but proceeds to impose a virtual ban on citizen contact with locally elected boards despite the fact that they were elected by those very citizens. It does so by declaring such communications to fall within prohibited "ex parte" contact with public officials charged in part with execution of quasi-judicial duties. To do so, the Court places heavy reliance on the case of *Hanig v. City of Winner*, 2005 SD 10, 692 NW2d 202. The issuance of this conditional use permit was obviously controversial within Turner County. All the more reason that the citizens should have the right to be heard and not silenced from contacting their local officials under the declaration of a ban upon "ex parte communications." What I had to advocate in my dissent in *Hanig* I continue to believe:

> Perhaps my strongest disagreement with the opinion of the Court is in its determination that citizen communication with the remaining five council members constituted an "indirect personal interest" which tainted their vote. This license application clearly was an important and controversial request within the City of Winner. Opposition to it at the council hearing ran the gamut . . . . What of the First Amendment which guarantees citizens the right of petitioning their public officials? Are phone calls, personal contact and letters to officials now tainted? What about indirect contact such as letters to the local newspaper? Are citizens now effectively silenced unless they personally appear at the meeting to voice

> their objections? "'Whatever differences may exist about
> interpretations of the First Amendment, there is practically
> universal agreement that a major purpose of the Amendment
> was to protect the free discussion of governmental affairs.'"

*Hanig,* 2005 SD 10, ¶44, 692 NW2d at 215 (Gilbertson, C.J., dissenting) (citing

State v. Springer-Ertl, 2000 SD 56, ¶11, 610 NW2d 768, 771 (citing Landmark

Communications, Inc. v. Virginia, 435 US 829, 838, 98 SCt 1535, 1541, 56 LEd2d 1,

10 (1978) (quoting Mills v. Alabama 384 US 214, 218, 86 SCt 1434, 1437, 16 LEd2d

484, 488 (1966))).

[¶43.] Further, the Court attempts to bolster its doctrine by citation to SDCL

1-26-26 which precludes ex parte contact with agency boards and employees. While

conceding it does not explicitly apply, it then goes on to reverse course by declaring

it sets forth "a generally accepted directive against ex parte communications and

can provide guidance for quasi-judicial local entities." *See supra* ¶27. Yet SDCL 1-

26-1(1) which defines the term "Agency" specifically excludes from the scope of that

chapter "any unit of local government." Could this be a legislative recognition that

those citizens who elect their local officials have a constitutional right to contact

them?

[¶44.] In conclusion, a due process violation does not occur simply because a

person serves in two roles. Furthermore, an elected official in South Dakota's

communities will inevitably have contact with citizens about matters of public

interest. Such contacts alone will not require the official to recues him or herself

from serving as a quasi-judicial official in another capacity. It is only when the

official's authority, statements, or actions regarding the issue while serving in one

role create an unacceptable risk of bias when serving in the other that they must do so, i.e. when a reasonably-minded person would conclude that the official's interests in the matter had the likely potential to influence his impartiality in its resolution.

[¶45.]    I believe the majority has either unclearly or erroneously identified the disqualifying conflict in this case. The due process violation does not arise because Van Hove wore two hats. Neither does it arise should he have received citizen input prior to the hearing. Instead, the violation occurred because the extent to which Van Hove involved himself in the issue while wearing his county commissioner hat would lead a reasonably-minded person to conclude that his impartiality had been influenced when wearing his board of adjustment hat. Clearly Commissioner Van Hove could not be allowed to organize a campaign to extract the county from its legal difficulties and then vote as a member of the Board to do so. That is as far as this Court need go to decide this matter.

[¶46.]    For the above reasons, I concur in result.